59 N.J. Super. 189 (1960)
157 A.2d 524
REINAUER REALTY CORP., PLAINTIFF-RESPONDENT,
v.
JAMES V. NUCERA, BUILDING INSPECTOR OF THE TOWNSHIP OF LYNDHURST, ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 14, 1959.
Decided January 26, 1960.
*192 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. Fred G. Stickel, III, argued the cause for appellants (Mr. Frank A. Piscatella, attorney).
Mr. John W. Griggs argued the cause for respondent (Messrs. Morrison, Lloyd & Griggs, attorneys).
The opinion of the court was delivered by HANEMAN, J.A.D.
Defendants appeal from a reversal by the Law Division of the denial by the Board of Adjustment of the Township of Lyndhurst (Lyndhurst) of plaintiff's application for a variance from the provisions of the Lyndhurst zoning ordinance.
Plaintiff owns a tract of land of an area of approximately five acres, situate in Lyndhurst and lying between the Passaic River and Riverside Avenue, at the southwest corner of Riverside and Kingsland Avenues. The lands lie within a district classified as a "Light Industrial Zone" under the zoning ordinance. That ordinance provides, inter alia:
"Article VI  Regulations.
In a Light Industrial Zone no building or premises shall be used and no building shall be erected which is arranged, intended or designed to be used for any of the following specified trades, industries or uses:

* * * * * * * *
28. Petroleum, storage in excess of 200,000 gallons.

* * * * * * * *
No dwellings for more than two families shall be constructed in a light industrial zone. All dwellings erected in a light industrial zone shall be erected in conformity with the regulations laid down for the `B' residence zone."
Plaintiff is a closed family corporation. It or its predecessor corporations, with practically identical stockholders, has owned this tract since 1929 and has there conducted a petroleum distribution business. Incident to such business it has stored gasoline and fuel oil in tanks.
*193 Before May 6, 1958 15 petroleum storage tanks with a total capacity of 310,000 gallons, but no one of which contained over 200,000 gallons, had been erected on the aforesaid lands and were being used by plaintiff. On that date plaintiff applied to the Bureau of Fire Protection of Lyndhurst, under ordinance 1231 (fire prevention ordinance), for a permit to erect two additional tanks with a storage capacity of 600,000 gallons each. The application was denied.
On May 8, 1958 plaintiff applied to the Lyndhurst building inspector for a building permit for the construction of said two petroleum storage tanks on said premises. The application was denied. Plaintiff thereupon appealed the refusal of the building inspector to the zoning board of adjustment and sought a variance under N.J.S.A. 40:55-39(d). The notice of appeal, insofar as here pertinent, reads:
"Relief is sought under subsection (d) of N.J.S. 40:55-39 (N.J.S.A. 40:55-39(d)). Under Lyndhurst Zoning Ordinance, Article VI, § 28, the appellant is permitted to erect an unlimited number of tanks for the storage of petroleum, provided that no one tank is of a capacity in excess of 200,000 gallons of petroleum. In lieu thereof, the appellant seeks permission to erect two 600,000 gallon petroleum storage tanks instead of six 200,000 gallon tanks and alleges that the relief can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and Zoning Ordinance."
At a hearing held by the board of adjustment on May 22, 1958, plaintiff adduced the following testimony, all of which was bottomed upon the assumption that the ordinance permitted the erection of an unlimited number of petroleum storage tanks of a maximum capacity of 200,000-gallons each.
Max P. Schiffman, comptroller of plaintiff, testified: (1) the ordinance permits an unlimited number of 200,000-gallon tanks on each plot of land; (2) two 600,000-gallon tanks would require less space than six 200,000-gallon tanks; (3) it would be more economical and safer to operate the two larger tanks than to operate the six smaller tanks; *194 (4) it was less costly to construct the two larger tanks than it would be to construct the six smaller tanks; (5) plaintiff could more economically and efficiently operate its business with two large tanks rather than with six small tanks; (6) plaintiff planned to install a foam system and generator for the proposed tanks  a feature missing from tanks of 200,000-gallon or less capacity. He stated that the reason for the failure so to provide similar protection on a tank of 200,000-gallon capacity was that such tank "does not require the same protection." He denied, however, that the larger tank was more hazardous, and gave as an additional reason for the failure so to provide, that it was a question of economics, asserting that the cost of such equipment was disproportionately large in relation to the erection cost of the smaller tank.
Horace R. Bogle, a real estate expert, testified that the construction of the two 600,000-gallon tanks rather than six 200,000-gallon tanks would not affect the value of adjacent property and would, insofar as property values are concerned, be preferable to six 200,000-gallon tanks.
Frank B. Kilian, an employee of the Fire Insurance Rating Bureau of New Jersey, testified that the construction of the two proposed 600,000-gallon tanks would not increase the fire insurance rates in the neighborhood over the rate resulting from the construction of six 200,000-gallon tanks, provided the former were equipped with a "standard dike, foam system, standard vent, or things of that sort."
Numerous neighborhood residents registered their personal objections, based primarily upon the fear of additional fire hazard. Such statements were made in the nature of arguments, and not delivered under oath.
A Mr. Mangini, an owner of a home within 200 feet of plaintiff's lands, disputed plaintiff's contention that the zoning ordinance permitted the further construction of tanks with a total capacity of 1,200,000 gallons, and asserted that the ordinance restricted the lands to tanks having a total capacity of 200,000 gallons.
*195 The board of adjustment denied the application, without giving reasons. Plaintiff thereupon filed an action in lieu of prerogative writs, consisting of nine counts. The first count appealed the decision of the board of adjustment. The remaining eight counts contested the validity of ordinance 1231.
Plaintiff's pretrial memorandum discloses the assertion of the following special reasons for a variance:
"* * * all that the plaintiff was seeking was permission to erect tanks larger than those specifically allowed, the action of the defendant Board of Adjustment must indeed be considered arbitrary, capricious and unreasonable.
The `special reasons' advanced at the hearing before the Board of Adjustment were:
1. Two 600,000 gallon tanks would take up less room on the plaintiff's property than six 200,000 gallon tanks (Ex. P-6, p. 5).
2. The economy in their erection would as a matter of economies, warrant diking and a foam system which are not required for 200,000 gallon tanks (Ex. P-6, p. 5).
3. Additional tanks are necessary from a business standpoint to accommodate the business built up in the area (Ex. P-6, pp. 5, 6).
4. Total cost for two 600,000 gallon tanks would be $64,000 as opposed to $102,000 for six 200,000 gallon tanks (Ex. P-6, pp. 6, 7).
5. Two tanks would be more convenient and practical than six tanks of the same capacity (Ex. P-6, p. 7).
6. They would effect more efficiency in the unloading from oil boats and discharging into tank trucks (Ex. P-6, p. 7).
7. They would be better than six 200,000 gallon tanks from the point of view of the value of adjacent property (Ex. P-6, pp. 13, 14).
8. Their erection and maintenance would not affect the marketability and interest of adjacent property (Ex. P-6, pp. 13, 14).
9. Their erection and maintenance would not affect the fire insurance rates of the premises in question or of adjacent properties (Ex. P-6, pp. 16, 17, 18, 20).
We submit that the above proof constituted more than sufficient `special reasons' for granting the relief requested by the plaintiff. As was stated in Moriarty v. Posner, 21 N.J. 199, 211 (1956), the purpose of granting variances is to `avoid an undue invasion of the right of private property by compelling conformance to an unsuitable permissible use, a burden upon the individual landowner that would be disproportionate to the common need.' Since plaintiff could erect as many 200,000 gallon tanks as it desired under the Zoning Ordinance, (Ex. P-1, Art. VI, Sec. 28) (assuming this *196 Ordinance is not void for ambiguity), it is clear that the action of the defendant Board of Adjustment was arbitrary, capricious and unreasonable.
The erection of two 600,000 gallon tanks should not be denied the plaintiff on the basis of bowing to the `common need.' The uncontradicted testimony was that adjacent property values would not suffer as much by the erection of two tanks as they would by the erection of six tanks with the same capacity permitted under the ordinance."
After a preliminary hearing on May 5, 1959, the Law Division remanded the matter to the board of adjustment for a further hearing and for the adoption by the board of adjustment of "an appropriate resolution which shall contain its reasons for whatever decision it shall reach."
On May 27, 1959 the board of adjustment held a second hearing, consistent with the remand by the Law Division. Plaintiff then produced B. Franklin Reinauer, secretary-treasurer of plaintiff, Paul A. Romaine, a deputy fire chief of the Hackensack Fire Department, and Latham S. Squire, consultant engineer specializing in zoning.
Reinauer testified as to the length of ownership of plaintiff's property, the business there conducted and the use of adjacent properties. He admitted that plaintiff's primary concern in seeking the variance was of "pecuniary or financial interest."
Romaine testified that the plans of the proposed tanks complied with the code of the National Board of Underwriters and if so constructed they would not create a hazard to the adjoining properties. He stated, however, that he was "not testifying as an expert."
Squire testified that the proposed construction could be accomplished without "detriment to the public good" in a light industrial zone and that it was unfortunate that some people had built homes in that zone. He further stated that it could not possibly destroy or harm the purpose and interest of the zoning ordinance.
Except for the statements of concern over a fire hazard asserted at the first hearing by neighbors owning homes *197 adjacent to plaintiff's plant, no affirmative testimony was adduced by defendants or any objectors at either hearing.
The board of adjustment thereafter adopted a resolution which reads, in part:
"The application of the owner for the erection of tanks as described herein on said premises is not approved and the variance is hereby denied for the following reasons, and the action of the Building Inspector of the Township of Lyndhurst is in all things confirmed:
(a) It is found as a matter of fact that the relief sought is not in the public interest and cannot be granted without substantial detriment to the public good and will substantially impair the intent and purpose of the zoning plan and zoning ordinance;
(b) The local Zoning Ordinance enacted on April 13, 1938 is clear in that Article VI, Subdivision 28, provides as follows:
`In a Light Industrial Zone no building or premises shall be used and no building shall be erected which is arranged, intended or designed to be used for any of the following specified trades, industries or uses:

* * * * * * * *
28. Petroleum, storage of in excess of 200,000 gallons.'
It is found, as a matter of fact, that the owner is presently exceeding the limitation so imposed by the within section of the Zoning Ordinance.
(c) The erection of the additional tanks will give rise to a greater fire hazard, a problem [with] which the Township of Lyndhurst cannot cope because of the unavailability of facilities to fight such a fire as may occur upon the erection of said tanks."
On June 22, 1959 the matter came on for final argument before the Law Division. The trial judge concluded that ordinance 1231 (having nothing to do with zoning) was invalid; that the zoning ordinance restricted plaintiff's entire plot to one storage tank of a maximum capacity of 200,000 gallons; and that the special reasons set forth in the pretrial memorandum were without merit. The court, however, reversed the denial of the variance on the ground that the additional gallonage would not increase the fire hazard and that there was not "any justification for this refusal to make the recommendation, and the reasons advanced by the Board of Adjustment have no factual basis in the record, which makes their denial of the recommendation arbitrary, capricious and unreasonable, and all I can do is set it aside."
*198 Defendants appeal from the final judgment only insofar as it concerns the variance.
We are obliged first to determine the meaning of the section of the ordinance sought to be varied.
Article VI reads, in part:
"In a Light Industrial Zone no building or premises shall be used and no building shall be erected which is arranged, intended or designed to be used for any of the following trades, industries or uses:" (Emphasis supplied.)
There follows a list of 49 numbered sections, each referring to a specific trade, industry and use. The section of article VI with which we are particularly concerned is section 28, which reads:
"28. Petroleum, storage in excess of 200,000 gallons."
Plaintiff here argues, as it did before the board of adjustment and the Law Division, that the prohibition applies solely to the use of buildings and not to land. It rationalizes that since the purpose of the ordinance is to limit the capacity of each tank (building) and not to limit the use of land, that it must naturally follow the ordinance permits the erection and use of an unlimited number of petroleum storage tanks on any tract of land, regardless of the area thereof, provided no single tank has a storage capacity in excess of 200,000 gallons. From this premise it concludes that the variance which it seeks is the substitution of two 600,000-gallon tanks for an allowable six 200,000-gallon tanks. The testimony adduced by plaintiff before the board of adjustment was directed to establishing special reasons for such a variance, and that such a variance could be granted without a violation of the interdiction of N.J.S.A. 40:55-39 above quoted. To reach this conclusion plaintiff must regard the words "building" and "premises" as synonymous.
The prohibitory portion of article VI is divided into two parts, joined by the conjunctive "and." The first prohibits *199 the use of a "building or premises." The second prohibits the erection of a building "which is arranged, intended or designed to be used for any of the following * * * uses." Thus, there is evidenced a two-fold purpose to proscribe (1) the use of any building even though not initially arranged, intended or designed for one of the specified purposes, and the use of any premises for such specified purposes, and (2) the erection in futuro of a building particularly arranged, intended or designed to be used for such purpose.
Were we to accede to plaintiff's view of the identity of the meaning of "building" and "premises," the ordinance need only have provided that "no building may be used." Plaintiff's interpretation would render superfluous both the reference to "premises" and the entire second portion of article VI.
A construction which will render any part of a statute or ordinance inoperative, superfluous or meaningless is to be avoided. State v. Sperry Hutchinson Co., 23 N.J. 38 (1956); 2 Sutherland, Statutory Construction, § 4705, p. 339 (1943).
"Premises" has been defined as "the property conveyed in a deed; hence, in general, a piece of land or real estate; sometimes * * * a building or buildings on land * * *." Ford Motor Co. v. New Jersey Dept. of Labor and Industry, 5 N.J. 494, 503 (1950). As here employed, "premises" is used in the primary sense and connotes a piece or tract of land. It follows that the storage, whether in one or more tanks, of more than 200,000 gallons on any single tract of land is proscribed. Parenthetically, we should note that the question of the reasonableness of such a provision has not been raised, briefed or argued, and we therefore do not pass thereon.
We come, therefore, to a consideration of the denial of the variance by the board.
The respective responsibilities of an applicant for a variance and the board of adjustment are set forth in Tomko v. Vissers, 21 N.J. 226, 239 (1956), where the court said:
*200 "The primary responsibility of the applicant is to supply competent and credible evidence to apprise the board of the nature and degree of the zoning burden sought to be alleviated through the variance procedure, and to demonstrate that the contemplated use of the property will not substantially impair the intent and purpose of the zoning plan as a whole nor be inconsistent with any of the purposes of zoning as defined by the Legislature in R.S. 40:55-32. Accord, Lumund v. Board of Adjustment, 4 N.J. 577, 586 (1950); Preye v. Board of Adjustment, 22 N.J. Super. 161, 176 (App. Div. 1952), certification denied 11 N.J. 328 (1953). Cf. Ward v. Scott, 11 N.J. 117, 125-126 (1952); Ranney v. Istituto Pontificio Delle Maestre Filippini, 20 N.J. 189, 199 (1955).
The responsibility of the board is then to weigh the evidence submitted and reach basic factual determinations. These basic findings, in essence, serve to reflect the board's conception of the true facts in the evidence presented. From the basic factual determinations the ultimate facts are to be derived. An affirmative or negative conclusion that the variance will not substantially impair the intent and purpose of the zoning plan nor be inconsistent with the various purposes of zoning (R.S. 40:55-32) would represent an ultimate finding, and from this the recommendation or rejection of the application will follow. New Jersey Bell Telephone Co. v. Communications Workers, 5 N.J. 354, 374-377 (1950); Davis, Administrative Law, 531-537 (1951)."
Under our construction of the applicable provisions of the zoning ordinance, it was plaintiff's responsibility to supply competent and credible evidence, to the reasonable satisfaction of the board of adjustment, that the construction of two 600,000-gallon tanks would not substantially impair the intent and purpose of the zoning plan as a whole nor be inconsistent with any of the purposes of zoning as defined in R.S. 40:55-32. One of such purposes, as delineated in the statute, is to "secure safety from fire, panic and other dangers."
There is no proof that a greater hazard of fire and possible explosion would not ensue from the erection of two 600,000-gallon petroleum storage tanks than would ensue from the construction of but one 200,000-gallon tank. The only testimony covering fire hazard was that of Romaine, whose sole contention was that two 600,000-gallon petroleum storage tanks would contribute no greater fire hazard than would be created by six 200,000-gallon petroleum storage tanks. *201 Furthermore, as noted, Romaine did not testify as an expert; his conclusion was based upon a compliance by plaintiff with the code of the National Board of Underwriters who, as he testified, adopted the code to "establish safety practices, safety formulas, safety installations." On cross-examination he testified, "I am quoting the National Fire Company [code] which is expert in itself." This is a far cry from expert testimony to the effect that no greater hazard of fire or explosion would accompany the use of the proposed tanks than would accompany the use of the permitted tank.
The board of adjustment exercises a quasi-judicial function. Schmidt v. Board of Adjustment of Newark, 9 N.J. 405, 420 (1952). In so functioning, as with other administrative agencies, it has the choice of accepting or rejecting the testimony of witnesses. Where reasonably made, such choice is conclusive on appeal. Cf. Hornauer v. Division of Alcoholic Beverage Control, 40 N.J. Super. 501, 506 (App. Div. 1956).
The board is not obliged to function in a vacuum. It may and should bring to bear in its deliberations the general information and experience of its individual members.
In Pennsylvania Railroad Co. v. Department of Public Utilities, 14 N.J. 411, 427 (1954), the court said:
"In the course of the hearing the board must be given full latitude to avail itself of the wealth of general information and expert knowledge which it obtains in the performance of its day-to-day administrative activities. Cf. Elizabeth v. Board of Public Utility Com'rs., 99 N.J.L. 496, 497 (E. & A. 1924); In re Port Murray Dairy Co., 6 N.J. Super. 285, 296 (App. Div. 1950). By taking appropriate official notice, making it part of the hearing record, and affording fair opportunity of refutation, the board may adequately protect both the public and private interests concerned. See Krauss v. A. & M. Karagheusian, 13 N.J. 447, 461 (1953); Davis, Official Notice, 62 Harv. L. Rev. 537 (1949)."
See also City of Passaic v. Passaic County Bd. of Taxation, 18 N.J. 371 (1955); Elizabeth Federal S. & L. Assn. v. Howell, 24 N.J. 488, 506 (1957); Krauss v. A. & M. *202 Karagheusian, 13 N.J. 447, 461 (1953); Mazza v. Cavicchia, 15 N.J. 498 (1954).
The board may take judicial notice of such matters as are so notorious as not to be the subject of reasonable dispute. In 2 Davis Administrative Law, § 1508, p. 390 (1958), it is stated:
"The difference between the ability of a small child and the ability of an experienced judge or administrator to decide a complex case is not merely a difference in skill; it is also a difference in knowledge. We expect the judge or administrator to use his knowledge in deciding which witness ought to be believed, in inferring further facts from the facts specifically established, in discovering or creating law, in formulating policy, in exercising discretion. The knowledge that is necessarily used  what we regard as experience  is often too elusive for articulation. If the recommendations of the three organizations were adopted and were applied literally, nearly every administrative decision would be subject to reversal on account of necessary use of information which the parties have not had a chance to controvert.
In this light, the idea that the judge or officer must give notice to the parties before he can base his decision on any extra-record facts is an absurdity."
And again, § 15:14, p. 432:
"* * * The most obvious facts often may be used without even stating that they are being noticed; the less obvious or the more critical or debatable the facts may be, the more the reason for mention. In probably ninety-nine out of a hundred instances of judicial or official notice, tribunals use extra-record facts without even mentioning that they are doing so. For instance, a tribunal normally knows the meaning of the word `the' and the existence of organized government only through extra-record information, and it could hardly be expected to recite such facts."
Gasoline has been recognized by our courts as being a "highly inflammable and explosive substance." Reingold v. Harper, 6 N.J. 182 (1951). The board was amply justified in taking judicial notice of this fact and in concluding that a conflagration and possible resulting explosion of two 600,000-gallon petroleum storage tanks would create a greater fire hazard than would attend a conflagration and *203 possible explosion of but one 200,000-gallon tank. Nor is it conceivable that any believable contrary testimony could be advanced.
It must be remembered that in the district with which we are concerned, dwellings for no more than two families are specifically permitted and that the testimony disclosed a number of such residences in the immediate neighborhood of plaintiff's lands.
Although it must be recognized that generally matters dehors the record, of which a board of adjustment has knowledge or takes official notice, must be made a part of the record in order to afford the applicant a fair opportunity of refutation, Pennsylvania Railroad Co. v. Department of Public Utilities, supra; Dolan v. De Capua, 16 N.J. 599, 610 (1954), it does not follow that in every instance such matters upon which the board relies in weighing the evidence and reaching a reasoned conclusion must be so spread upon the record. Where matters so recognized and employed in reaching a conclusion are of such a self-evident nature that it is beyond reasonable debate that they could not be rebutted or contradicted there is no necessity to accord an applicant such an opportunity.
We conclude that the board was not arbitrary, capricious or unreasonable in denying the variance and that it was justified in relying upon its common knowledge in reaching that conclusion. Under the facts here present, there was no reason to note the basis of its determination on the record and afford plaintiff an opportunity to rebut the board's conclusion denying the variance for the reason "that the erection of the additional tanks will give rise to a greater fire hazard * * *." The basis for this conclusion is adequately stated, reasonably justified and sufficiently supports the action taken.
Plaintiff, as noted, also advances various special reasons for a variance which concern the economic and financial benefits to be derived from a grant thereof. The mere fact that the desired use, in disregard of zoning restrictions, *204 would be more profitable to the applicant is, by itself, an insufficient ground for granting a variance. The welfare of the community will not be sacrificed for the purpose of permitting the most profitable use of premises. Monmouth Lumber Co. v. Ocean Township, 9 N.J. 64, 78 (1952); Whitehead v. Kearny Zoning Bd. of Adjustment, 51 N.J. Super. 560, 570 (App. Div. 1958). So here, the welfare of the community should not be sacrificed for the sole purpose of a more profitable use of its lands by plaintiff.
In the light of the foregoing conclusion it will not be necessary to treat of the other grounds of appeal raised by defendants.
Reverse.