ST. JOHN'S EVANGELICAL LUTHERAN CHURCH, REVEREND TRIFFEL L. FELSKE, IN HIS CAPACITY AS PASTOR, THE HOBOKEN CLERGY COALITION, ALFRED DAVIS AND WALTER RISSLAND, PLAINTIFFS, v. CITY OF HOBOKEN AND ALFRED N. AREZZO, CONSTRUCTION OFFICIAL, BUILDING SUB CODE OFFICIAL, ZONING OFFICER, HISTORIC DISTRICT OFFICER, DEFENDANTS.

Superior Court of New Jersey
Law Division Hudson County

Decided October 27, 1983.

416

*Margaret M. Welch,* attorney, for plaintiffs Reverend Triffel L. Felske, St. John's Evangelical Lutheran Church and the Hoboken Clergy Coalition.

*Jorge Aviles,* attorney, for plaintiffs Alfred Davis and Walter Rissland.

*Thomas P. Calligy*, attorney, for defendants City of Hoboken and Alfred N. Arezzo.

HUMPHREYS, A.J.S.C.

This case poses an important issue as to the breadth of religious freedom when confronted with the zoning authority of local government.[1] The Hoboken municipal authorities seek to close a shelter for homeless people operated by plaintiff, St. John's Church. Plaintiffs seek an injunction against the closing, asserting their constitutional right to religious freedom. The primary issue, not previously determined in this State, is whether a municipality may through its zoning laws constitutionally prohibit a church from operating a shelter for the homeless on its premises. My ruling is that the municipality may not.

The facts are essentially not in dispute. Last winter the members of the Hoboken Clergy Coalition "determined that the plight of the homeless was one of the most pressing needs in our city." (Affidavit of Rev. Felske ¶ 2–4). The Coalition therefore began operating a shelter in the basement of St. John's Church supported by donations from member churches. *Ibid.* The shelter feeds 30 to 50 persons an evening meal and provides sleeping accomodations for them. The next morning the people are given breakfast and "returned to the streets." *Ibid.*

Under the Hoboken zoning ordinance a church is a permitted use in the zone in which St. John's is located. Hoboken Zoning Ordinance § 4.5205. Permitted as accessory uses are "other uses customarily incident to principal uses and on the same lot." Hoboken Zoning Ordinance § 4.5203. The church contends that a shelter for the homeless is an accessory use to a church.

---

[1]This is a refinement of an oral opinion.

Rev. Felske states in his affidavit submitted on behalf of plaintiffs:

> The concept of sanctuary has been a strong element of religious tradition from Moses to the New Testament. [*Id.* at ¶ 7.]
>
> Sheltering the homeless and caring for the poor has consistently been a church function, carried out for centuries by religious persons. It is among one of the basic mandates in the Judeo-Christian heritage. [*Id.* at ¶ 7.]
>
> Throughout history the churches have carried out [the] biblical mandate to aid the poor and the helpless. Sanctuary became such a strong religious tradition it was recognized in Roman, medieval, and English common law. During the middle ages every church was a potential sanctuary. [*Id.* at ¶ 12.]
>
> The American colonies, particularly those with strong religious leadership and affiliation, e.g. Rhode Island, Pennsylvania and Maryland were seen as refuges from the political and religious persecutions of seventeenth century Europe. After the passage of the Fugitive Slave Act, churches and religious persons became stations along the Underground Railroad providing food and shelter for escaping slaves. [*Id.* at ¶ 13.]
>
> More recently churches and synagogues throughout this country have opened their doors to the homeless and oppressed. Although precise statistics are not available on the number of homeless shelters, these include hundreds from coast to coast. Over 50 churches and synagogues in New York City sheltered the homeless this past winter. Congregations in San Francisco, Atlanta, Minneapolis-St. Paul, Hartford, Jersey City and Chicago opened their doors to the poor. [*Id.* at ¶ 14.]
>
> The Hoboken Clergy and their churches are fulfilling their religious obligations and exercising a traditional religious function in utilizing the basement of St. John's to shelter the homeless poor. [*Id.* at ¶ 15.]

The facts set forth by Rev. Felske strongly support the plaintiff's position that using the church as a sanctuary for the poor is a religious use "customarily incident" to the "principal uses".

The use of religious places as sanctuaries predates even the Christian Church.

> Sanctuary existed among the Greeks. The Romans are said to have recognized the peculiar sacredness attached to particular places as well as to the altars of their temples and the statues of their emperors. It is probable that the church sanctuary came into existence from the time of Constantine, A.D. 303. The code of Theodosius, A.D. 392, enacted a law concerning the asylum and church. A later law, about 450, extended the limits to the precincts including the houses of the bishops and clergy, the cloisters, courts and cemeteries. About 680 the King of Wessex in his code of laws provided for sanctuary. Many subsequent acts were passed in England regulating the subject.

In the Dark Ages, the church succeeded in establishing the doctrine that the blood-feud should be suspended during certain seasons ... and in certain places. If the accused could reach a place sheltered by the protection of the church, he could evade the challenge to battle. *See* 2 *Bouvier's Law Dictionary and Concise Encyclopedia* 3005 (8th ed. 1914).

■ Regardless of how the City's zoning ordinance is construed, a municipality may not exercise its zoning power in violation of the fundamental tenets of the First Amendment. Government is precluded under the First Amendment from "prohibiting the free exercise" of religion. *See also N.J. Const.* (1947), Art. I, § III.

Religious liberty has long been one of our most cherished freedoms. In *Sherbert v. Verner,* 374 *U.S.* 398, 413, 83 *S.Ct.* 1790, 1799, 10 *L.Ed.*2d 965 (1966), Justice Stewart said, "I am convinced that no liberty is more essential to the continued vitality of the free society which our Constitution guarantees than is the religious liberty protected by the Free Exercise Clause explicit in the First Amendment and imbedded in the Fourteenth."

■ Under the First Amendment, government must be neutral toward religion. *School District of Abington Tp. v. Schempp,* 374 *U.S.* 203, 221–222, 83 *S.Ct.* 1560, 1571–1572, 10 *L.Ed.*2d 844 (1963). Government may breach that neutrality if it denies or unreasonably limits the religious use of land. It is indeed late in the day for government to interfere with religion. Pilgrims and others who fled to this country in order to pursue their religious beliefs where and how they wished, undoubtedly thought they had ended government intrusion on religious liberty.

Courts have placed constitutional constraints upon municipal attempts to impose zoning regulations upon churches and other religious institutions. *See 2 Anderson, American Law of Zoning* (2d ed. 1976), §§ 12.18 to 12.27 at 442–446. "[T]he range of religious conduct is wide, and the structures which house it are various. Religious use is not defined solely in terms of religious worship." *Id.* at 458–62. Its use has been

extended to education; *Catholic Bishop of Chicago v. Kingery,* 371 *Ill.* 257, 20 *N.E.*2d 583 (1939) a day care center, *Unitarian Universalist Church v. Shorten,* 63 *Misc.*2d 978, 314 *N.Y.S.*2d 66 (Sup.Ct.1970); an orphanage, *University Heights v. Cleveland Jewish Orphan's Home,* 20 *F.*2d 743 (6th Cir.1927), *cert. den.* 275 *U.S.* 569, 48 *S.Ct.* 141, 72 *L.Ed.* 431 (1927); and a center for counseling drug users, *Slevin v. Long Island Jewish Medical Center,* 66 *Misc.*2d 312, 319 *N.Y.S.*2d 937 (Sup.Ct. 1971). *But see State v. Cameron,* 184 *N.J.Super.* 66 (Law Div.1982), aff'd. 189 *N.J.Super.* 404 (App.Div.1983), notice of appeal filed May 27, 1983.

In view of the centuries old church tradition of sanctuary for those in need of shelter and aid, St. John's and its parishioners in sheltering the homeless are engaging in the free exercise of religion. Hoboken cannot constitutionally use its zoning authority to prohibit that free exercise.

The principles governing the issuance of preliminary injunctive relief are set forth in *Crowe v. De Gioia,* 90 *N.J.* 126 (1982) as follows:

1. [A] preliminary injunction should not issue except when necessary to prevent irreparable harm.

2. [T]emporary relief should be withheld when the legal right underlying plaintiff's claim is unsettled.

3. [A] preliminary injunction should not issue where all material facts are controverted ... Thus, to prevail on an application for temporary relief, a plaintiff must make a preliminary showing of a reasonable probability of ultimate success on the merits ... That requirement is tempered by the principle that mere doubt as to the validity of the claim is not an adequate basis for refusing and maintaining the status quo ...

4. [T]he relative hardship to the parties in granting or denying relief must be weighed.

*Id.* at 132–134 [citations omitted].

The harm here is obvious, imminent and severe. If the shelter is closed its occupants will be left without food or shelter. Government alone is not presently able to cope with this grave social problem. *See* Statement of Governor Thomas H. Kean, Task Force On the Homeless delivered Oct. 24, 1983.

St. John's represents the only bulwark these homeless people have. To tear that bulwark away would be a travesty of justice and compassion. Any inconvenience to the City of Hoboken and its other residents pales into insignificance when contrasted with what the occupants of the shelter would have to face if turned out into the city streets in winter weather.

Plaintiffs have a strong case factually and legally. Irreparable harm will occur if a preliminary injunction is not issued. The equities, when balanced, are clearly in favor of the plaintiffs. Hence, a preliminary injunction will issue restraining the defendants from closing the shelter pending final hearing or further order of this court.

A second matter at issue involves health and safety requirements. Plaintiffs agree that the shelter must comply with appropriate health and safety laws and regulations, including reasonable occupancy requirements. The requirements should be appropriate to a shelter for the homeless. The church should not have to meet health and safety requirements imposed upon a commercial establishment such as a hotel. Moreover, the laws and regulations should be interpreted in a reasonable and common sense manner bearing in mind that overly strict enforcement might force the shelter to close, leaving its occupants in a far worse state than remaining in a crowded shelter.

For its part, the church must make a good faith effort to meet reasonable and appropriate health and safety laws and regulations. Plaintiffs concede that occupancy ordinances for homeless shelters in New York and Chicago permit no more than 20 people in space comparable to St. John's. Plaintiffs can meet that limit by relocating people in other churches or homes. Hence, St. John's will within the next two weeks reduce the occupancy to 20 persons and maintain that as a maximum number.

In summary, plaintiffs have persuasively argued that housing the homeless in a church is a religious use sanctioned by

centuries of scripture and practice. The zoning power may not be constitutionally used to preclude a church from exercising its religious function of providing a sanctuary for the homeless. Permitting the City to close the shelter would cause irreparable harm to the persons being sheltered. Granting the application for preliminary relief will not unduly harm the City provided reasonable safety and health regulations are complied with. A preliminary injunction will issue.