689 A.2d 804

RAE SHIM AND WASHINGTON WINES AND LIQUORS, INC., A NEW JERSEY CORPORATION, PLAINTIFFS-APPELLANTS, v. WASHINGTON TOWNSHIP PLANNING BOARD AND TRENTON SEVENTH DAY ADVENTIST CHURCH, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted January 27, 1997—Decided March 11, 1997.

Before Judges HAVEY, BROCHIN and EICHEN.

*Szaferman, Lakind, Blumstein, Watter & Blader, P.C.*, attorneys for appellants (*Jeffrey P. Blumstein*, of counsel and on the brief).

*Michael P. Balint, P.C.*, attorney for respondent Washington Township Planning Board (*Mr. Balint*, on the brief).

*Ridolfi, Friedman, Frank & Edelstein, P.C.*, attorneys for respondent Trenton Seventh Day Adventist Church (*Gary R. Backinoff*, on the brief).

The opinion of the court was delivered by

HAVEY, P.J.A.D.

This is an action in lieu of prerogative writs. Plaintiffs, Rae Shim and Washington Wines and Liquors, Inc., appeal from a judgment affirming the grant of site plan approval to the defendant Trenton Seventh Day Adventist Church (Church) for the construction of a church. The site plan approval, granted by defendant Washington Township Planning Board (Board), also authorizes the Church to operate a child day care center in the proposed facility. Plaintiffs argue that: (1) the day care component of the site plan application "constituted a variant use" requiring separate site plan and variance approvals; (2) the site plan approval for the Church was arbitrary, capricious and unreasonable since the Board failed to consider traffic congestion on abutting streets; and (3) plaintiffs were denied due process during the Board proceedings. We reject each contention and affirm.

The Church's ten-acre tract is situated on the corner of State Highway 33 and Washington Boulevard in Washington Township. The property is in the R1.5 (low density residential) zone. Churches are permitted uses in the R1.5 zone. The Church applied to the Board for site plan approval, as well as various bulk variances and design waivers, to construct a 15,380 square-foot church on the site. The proposed facility will include a religious

sanctuary, fellowship hall, offices, a library and a child care center. The Church proposed an entranceway onto Washington Boulevard, directly across from a strip shopping center in which plaintiffs' liquor store is located.

During the Board hearing, the bulk of the testimony focused on whether the increased traffic generated by the proposed church facilities would cause a traffic hazard on Washington Boulevard. Of particular concern to the Board was that the entranceway created a "four-way intersection" with the entranceway from the existing shopping center across Washington Boulevard. The Board was also concerned with increased traffic at the nearby intersection of Route 33 and Washington Boulevard. It therefore focused on traffic to and from the Church on Saturday mornings and afternoons, when the Church's religious services are conducted, and on weekday rush hours, when children will be dropped off and picked up from the day care center.

The Board considered the Church's traffic consultant's testimony that the entranceway would present a safe and efficient means of ingress and egress to and from Washington Boulevard. It also consulted with the Township's own planning officials, and considered alternative entranceways to the site, including a means of ingress and egress directly onto State Highway 33. After additional studies and workshop sessions, the Township's consultants concluded that alternative entranceways were less advantageous than the traffic plan presented by the Church. The Board subsequently voted in favor of the Church's site plan application.

In affirming the Board's actions, the Law Division judge rejected plaintiffs' claim that the Church was required to submit separate site plan and variance applications for the child care center. This was so, the judge reasoned, because the child care center was recognized as an "ancillary use" to the church and thus did not require an independent application. The judge also found that the Board's determinations concerning the traffic issues were well-founded on the record. Finally, the judge rejected plaintiffs' claim that their due process rights were violated during the proceedings,

concluding that plaintiffs had adequate opportunity to testify and express their views in opposition to the application.

I

We first address plaintiffs' contention that the day care center is not an accessory use to the principal use of the subject property as a church. Plaintiffs correctly point out that a day care center is neither a permitted nor conditional use in the R1.5 zone. Also, it is not one of the twelve enumerated accessory uses permitted in the zone. Plaintiffs note that the definition section of the ordinance states that "[a]ll uses not expressly permitted in this chapter are prohibited." Thus, plaintiffs reason, the proposed day care center is a "variant" use requiring the Church to make separate site plan and use variance applications to the zoning board. *See N.J.S.A.* 40:55D–70d; *see also Wyzykowski v. Rizas,* 132 *N.J.* 509, 533, 626 *A.*2d 406 (1993).

It is true that under the express provisions of the ordinance, there are twelve, enumerated accessory uses "permitted" in the R1.5 zone. They include greenhouses, landscaping contracting services, horticultural structures, farm buildings and the keeping of animals in fenced areas, dog kennels, private swimming pools, fences and walls, tool sheds, campers, off-street parking and private garages, and satellite antenna dishes. Day care centers are not included in the list of permitted accessory uses.

In order to accept plaintiffs' argument, we must conclude that, because Washington Township's governing body did not include day care centers in the permitted accessory uses expressly enumerated, it intended to prohibit such uses in the R1.5 zone. As in the case of statutes, our aim in construing a zoning ordinance is to discover legislative intent. *Wright v. Vogt,* 7 *N.J.* 1, 5–6, 80 *A.*2d 108 (1951); *White Castle Sys. v. Planning Board,* 244 *N.J.Super.* 688, 691, 583 *A.*2d 406 (App.Div.1990), *certif. denied,* 126 *N.J.* 320, 598 *A.*2d 880 (1991). We ascertain the "sense in which the terms were employed by the legislative body." *Wright, supra,* 7 *N.J.* at 6, 80 *A.*2d 108; *see also AMN, Inc. v. Township of South*

*Brunswick Rent Leveling Board,* 93 *N.J.* 518, 524–25, 461 *A.*2d 1138 (1983); William M. Cox, *New Jersey Zoning and Land Use Administration* § 5–2.3 at 86 (15th ed.1996). The question is whether plaintiffs' interpretation "is consistent with both 'the *letter* and underlying *philosophy* of the ordinance.'" *Wyzykowski, supra,* 132 *N.J.* at 520, 626 *A.*2d 406 (quoting *Keller v. Town of Westfield,* 39 *N.J.Super.* 430, 435, 121 *A.*2d 419 (App.Div.1956)).

Plaintiffs' construction of the ordinance runs counter to the settled rule that an accessory use need not derive from the express terms of the ordinance; an accessory use is implied as a matter of law as a right which accompanies the principal use. 2 Arden H. and Daren A. Rathkopf, *The Law of Zoning and Planning* § 23.01 at 23–6 (4th ed.1985). Rathkopf states the proposition as follows:

> The term accessory uses as used by the courts may be predicated upon a specific provision relating to accessory uses found in the ordinance, or *may be based upon the concept that whether or not the ordinance provides for accessory uses, the litigated use is one so customarily incidental to the principal use of the zoning lot that it is, as a matter of law, a part of the permitted use.*
>
> [*Ibid.* (emphasis added).]

*Accord Borough of Northvale v. Blundo,* 85 *N.J.Super.* 56, 59, 203 *A.*2d 721 (App.Div.1964) (even if the zoning ordinance does not speak "in terms of a use accessory to the residence use, an accessory use must ordinarily be implied—as a matter of law—as a right which accompanies the principal use"); *Zahn v. Board of Adj.,* 45 *N.J.Super.* 516, 521–22, 133 *A.*2d 358 (App.Div.1957) (allowance of a primary use "generally authorizes all uses normally accessory, auxiliary or incidental thereto"). In our view, it is not consistent with "the letter and underlying philosophy" *Keller, supra,* 39 *N.J.Super.* at 435, 121 *A.*2d 419, of Washington Township's ordinance to conclude that its drafters intended to abrogate this settled zoning principle simply because it enumerated specific "permitted" accessory uses. We note, for example, that public playgrounds and public and parochial schools and colleges are permitted in the R1.5 zone. We doubt that the municipality intended that lighting for the playgrounds or athletic fields for the schools are prohibited because lighting and athletic fields are not

among the twelve specified items enumerated as permitted accessory uses in the zone. *See Tullo v. Township of Millburn,* 54 *N.J.Super.* 483, 496, 149 *A.*2d 620 (App.Div.1959) ("[u]sual accessory uses ... to main buildings or uses must have been contemplated. To hold otherwise would preclude the private school from having a playground or athletic field, the hospital from having a nurses' home or the cemetery a chapel").

Indeed, it is significant that the zoning ordinance provides a general definition of an "accessory use," as one which is: (1) "subordinate to" and serves a principal use; (2) located on the same lot as the principal use; and (3) "customarily incidental" to the principal use. Inclusion of this definition strongly suggests that the governing body intended to extend permitted accessory uses beyond those enumerated in the R1.5 zone, provided that the proposed use satisfies the three-prong test under the definition. To conclude otherwise would render the general definition of accessory use superfluous.

Our Supreme Court addressed a similar zoning ordinance in *State v. P.T. & L. Constr. Co.,* 77 *N.J.* 20, 24–26, 389 *A.*2d 448 (1978). There, plaintiff was seeking site plan approval for the installation of a heliport as an accessory use to its construction company headquarters in a limited industrial zone. The zone permitted accessory uses if the use was customarily incident and subordinate to the permitted use and not in violation of the provisions "set forth herein." *Id.* at 25, 389 *A.*2d 448. The ordinance then stated: "The following accessory uses are permitted," and itemized eleven specific accessory uses. Heliports were not included on the list. *Ibid.* The municipality advanced the same argument plaintiffs advance here, that all uses not expressly permitted in the zone are prohibited in that the list of accessory uses specified in the zone is "exclusive." *Id.* at 26, 389 *A.*2d 448. The Court accepted the applicant's contrary argument that the allowance of accessory uses in general terms was intended to extend beyond the eleven specific accessory uses enumerated therein. The Court was "impressed" with the applicant's conten-

tion "that under the borough's proposed construction of the ordinance the introductory proviso alluding to 'customarily incident' accessory uses would be meaningless as mere surplusage." *Ibid.* The Court concluded:

> The argument goes on to aver that the itemization of specific accessory uses was intended only to provide examples of valid accessory uses for ease of administration of the ordinance. This is persuasive. Otherwise any number of other uses, unquestionably incident to the main use as a matter of custom or convenience, would automatically be disqualified.
>
> [*Ibid.*]

The same is true here. The accessory uses specifically listed in the R1.5 zone were intended "only to provide examples of valid accessory uses for ease of administration"; *ibid,* they were not intended to exclude accessory uses, implied as a matter of law, "as a right which accompanies the principal use." *Borough of Northvale, supra,* 85 *N.J.Super.* at 59, 203 *A.2d* 721; *but see L.I.M.A. Partners v. Borough of Northvale,* 219 *N.J.Super.* 512, 518, 530 *A.2d* 839 (App.Div.1987) (absent a general provision in the ordinance that any use "customarily incident to the permitted use" is a permitted accessory use, the specific designation of eight accessory uses must be deemed exclusive).

## II

We therefore turn to the question of whether the proposed day care center should be considered an "accessory use" to the Church as that term is defined by the Township's land use ordinance. The trial judge found:

> [T]here is no requirement that there be a separate site plan consideration. The use of a child care center in the context of church activity is well recognized as an ancillary use certainly by this Court. Child care centers are very much a ... service provided by a church or other institutions, and they need not stand alone, and there is no necessity under the circumstances here to have separate site plan consideration. I note that the number of children involved I believe amounted to 60 at a maximum. A relatively small number, and given the nature of the traffic and the nature of the—the use on the church premises that there was no necessity for consideration of a separate site plan.

*P.T. & L. Constr. Co.* succinctly summarized the law on accessory uses as follows:

> In analyzing whether a use is customarily incident to the permitted use, two determinations must be made. The first is whether the use is *incidental* to the main use: does the use " * * * bear a close resemblance and obvious relation to the main use to which the premises are put"? Second, it must be determined whether a use which is found to be incident to the permitted use is also a customary use. Generally, a use which is so necessary or commonly to be expected that it cannot be supposed that the ordinance was intended to prevent it will be found to be a customary use. The fact that a use is not customarily indulged in, however, is not conclusive, and even if the use in question is found in a small percentage of similar main uses, the use may still be found to be "customary".
>
> [*P.T. & L. Constr. Co., supra,* 77 *N.J.* at 26–27, 389 *A.*2d 448 (quoting *Honigfeld v. Byrnes,* 14 *N.J.* 600, 606, 103 *A.*2d 598 (1954)) (citations omitted).]

In *Charlie Brown of Chatham, Inc. v. Board of Adj.,* 202 *N.J.Super.* 312, 495 *A.*2d 119 (App.Div.1985), our court offered a similar analysis. First, "the use must be one which is subordinate and minor in significance." *Id.* at 324, 495 *A.*2d 119. Second, it must:

> incorporate the concept of reasonable relationship with the primary use. It is not enough that the use be subordinate; it must also be attendant or concomitant. To ignore this latter aspect of "incidental" would be to permit any use which is not primary, no matter how unrelated it is to the primary use.
>
> [*Ibid.*]

*Accord Wyzykowski, supra,* 132 *N.J.* at 518–19, 626 *A.*2d 406.

Hence, accessory uses generally are incidental, subordinate and "customarily" associated with the primary use. To be customarily associated, it must be shown that "it is usual to maintain the use in question in connection with the primary use." *Charlie Brown of Chatham, Inc., supra,* 202 *N.J.Super.* at 324, 495 *A.*2d 119. The use must be further examined to determine whether it has "commonly, habitually and by long practice been established as reasonably associated with the primary use." *Ibid.*

The law of accessory uses is "not difficult to recite but difficult to apply," *id.* at 323, 495 *A.*2d 119, presumably because of the often narrow distinctions between uses considered to be accessory and those which are not. For example, a coin-operated vending machine in the basement of a high-rise apartment did not violate a zoning ordinance which limited the use of the property to residential dwellings. *City of Newark v. Daly,* 85 *N.J.Super.* 555, 559–60, 205 *A.*2d 459 (App.Div.1964), *aff'd,* 46 *N.J.* 48, 214 *A.*2d 410 (1965).

However, a commercial cleaning depot in the basement of a multi-unit apartment building, where clothing could be dropped off by tenants for cleaning, was held to constitute a business within the prohibition of the zoning ordinance and was not an accessory use. *Zahn, supra,* 45 *N.J.Super.* at 521–22, 133 *A.*2d 358.

Washington Township's ordinance incorporates the "subordinate" and "customarily incidental to" criteria discussed in the above-cited law. It also requires an accessory use to be on the same lot as the principal use. The Church's proposed day care center clearly satisfies two of the three prongs of the accessory use test under the ordinance. It will be situate on the same lot as the church. It will also be "subordinate" to the church in that it will utilize less than twenty percent (3,000 square feet) of the 15,380 square-foot proposed church structure. *Cf. Hull v. Miami Shores Village,* 435 *So.*2d 868, 871 (Fla.Dist.Ct.App.1983) (church administrative building not accessory use where eighty percent of structure used for administrative purposes).

The question is whether the day care center is "customarily incidental" to the Church's principal use. It is undisputed that the principal use of the subject property is that of a church, a place of worship. Consequently, this principal and dominant use determines its character for zoning purposes.

Churches today are "rapidly expanding their activities and ministries, particularly in the areas of education and social services." Mark W. Cordes, *Where to Pray? Religious Zoning and the First Amendment,* 35 *U. Kan. L.Rev.* 697, 737 (1987). Thus, church buildings, once used solely for weekly worship, have become the center of diverse parochial and community activities conducted throughout the entire week, day and night. *Ibid.; see also* Rathkopf, *supra,* § 20.03 at 20–53. Rathkopf observes:

> The accessory uses to a church have been considered in a number of cases and may be summarized as follows: The accessory uses which are nonexcludable in such jurisdictions where churches themselves are nonexcludable are: mortuaries used in connection with a church, parochial schools, parking lots and playgrounds, convents, rectories, and monasteries, gymnasiums and swimming pools, meeting

rooms, auditoriums, Boy Scout rooms and other places of quasi-public assembly, *day care centers,* drug rehabilitation centers, and softball fields.
[*Id.* at 20–53, 20–54 (footnotes omitted) (emphasis added).]

What "bundle" of uses make up a church may be a matter of zoning law involving the interpretation of the land use ordinance. Cordes, *supra,* 35 *U. Kan. L.Rev.* at 738. However, constitutional issues may also arise "regarding the degree to which the [F]irst [A]mendment requires accommodation of various activities on church property." *Ibid.*

For example, it has been held that a church homeless shelter was "customarily incident" to the church's principal use, and therefore could not be prohibited by zoning laws. *St. John's Evangelical Lutheran Church v. City of Hoboken,* 195 *N.J.Super.* 414, 418–20, 479 *A.2d* 935 (Law Div.1983). The court was persuaded by the church's arguments that "sanctuary has been a strong element of religious tradition," sheltering the poor is "among one of the basic mandates in the Judeo–Christian heritage," and many "churches and synagogues throughout [the] country have opened their doors to the homeless...." *Id.* at 418, 479 *A.2d* 935. The court permitted the shelter on the basis of the First Amendment's Free Exercise Clause, holding that the shelter was necessary to the church because it fulfilled the church's religious obligations. *Id.* at 419–20, 479 *A.2d* 935. Similarly, it has been held that the constitutional right to exercise religion extends to a day care center for children because such a use falls "well within the ambit of religious activity." *Unitarian Universalist Church v. Shorten,* 63 *Misc.*2d 978, 314 *N.Y.S.*2d 66, 71 (Sup.Ct.1970).[1]

Other courts have focused exclusively on zoning grounds rather than on constitutional principles. For example, in *City of Richmond Heights v. Richmond Heights Presbyterian Church,* 764 *S.W.*2d 647 (Mo.1989), the city's ordinance included a definition of

---

[1] Because we resolve the issue on zoning grounds, we do not address whether a day care center must be deemed customarily incidental to a church's principal use under the First Amendment.

"accessory use" virtually identical to the definition found in Washington Township's ordinance. *Id.* at 648. In concluding that the proposed day care center was an accessory use, the court noted:

> The day care program is subordinate to the principal use of the church. It was created by the governing body of the church and funded by the church. The governing body determined the curriculum for the program and hired a director. The record shows that the church operates the day care to attract new members to the church and accomplish its mission of preaching the gospel and serving the community. Similarly, the day care is subordinate in area to the principal building and use of the church. The day care service contributes to the comfort and convenience of the church parishioners by providing child care for them. The day care proper is located on the same lot as the church and it is located in the same zoning district.
>
> *[Ibid.]*

Here, we may decide the case by applying principles of zoning without deciding whether the First Amendment is implicated.

The demand for regulated day care [2] in today's society cannot be questioned. The Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D-1 to -136, was amended in 1991, *L.* 1991, *c.* 278 (*N.J.S.A.* 40:55D-66.5a), to provide that family day care homes [3] shall be permitted in all residential districts within the community. In enacting the amendment, the Legislature underscored the compelling need for day care facilities:

> The Legislature finds and declares that:
>
> a. With over 50 percent of working-age women now in the workforce, the need for high quality child care is of vital importance;
>
> ....
>
> d. Given the paucity of decent, affordable child care combined with the current labor shortage in this State, it seems unreasonable to erect zoning barriers which effectively prevent the establishment of or, in some cases, continuation of, these valuable and vitally necessary family day care homes.

---

[2] Child care centers are subject to licensing under the Child Care Center Licensing Act, *N.J.S.A.* 30:5B-1 to -15.

[3] "Family day care home" is defined as "a private residence in which child care services are provided for a fee...." *N.J.S.A.* 30:5B-18c. The Church's proposal is a "child care center." *N.J.S.A.* 30:5B-3b. However, the declared purpose of the amendment to the MLUL regarding family day care homes is relevant because it focuses on the need for day care in general.

e. It is therefore in the public interest and a valid public policy for this Legislature to eliminate those barriers which currently exist which prevent the establishment, or continued operation of, family day care homes in residential neighborhoods.

[*N.J.S.A.* 40:55D–66.5a.]

*See also* Assembly Mun. Gov't Comm., *Statements to Senate Bill No. 1595* (1991).

Churches have, throughout the country, played a significant role in meeting this pressing need. Greg J. Matis, *Dilemma in Day Care: The Virtues of Administrative Accommodation,* 57 *U. Chi. L.Rev.* 573, 575 (1990). It is estimated that one-third of child care is religiously affiliated to some degree. Elizabeth J. Samuels, *The Art of Line Drawing: The Establishment Clause and Public Aid to Religiously Affiliated Child Care,* 69 *U. Ind. L.J.* 39, 99 (1993). According to the National Council of Churches, "church-housed programs probably constitute the largest group of day care providers in the nation." Matis, *supra,* 57 *U. Chi. L.Rev.* at 575 (citing Eileen W. Lindner, et al., *When Churches Mind the Children: A Study of Day Care in Local Parishes* 12 (1983)).

[F]ifty-six percent of the study's programs were housed and operated by the host churches. The churches typically view day care as an aspect of their particular ministries: some host churches are simply trying to provide a valuable community service, or to meet the day care needs of their congregations' families; others act out of evangelism and a desire to promote Christian education.

[*Id.* at 576 (citing Lindner, et al., *supra,* at 20–21).]

Almost none of the church-operated programs restrict participation to members of their own congregations. *Ibid.* (citing Lindner, et al, *supra,* at 26).

What is clear from this modern trend is that a church's ministry is not confined to prayer or dissemination of its religious beliefs. Religious institutions consider day care centers as part of their spiritual mission, not necessarily in advancing their religious teachings, but by providing a valuable community service. Grounded on this broad-based commitment, we are persuaded that a church-operated day care center is as much an incidental use of church facilities in the zoning context as a shelter for homeless people; *see St. John's Evangelical Lutheran Church, supra,* 195

*N.J.Super.* at 418–20, 479 *A.*2d 935; radio antenna towers, *see Burlington Assembly of God Church v. Zoning Board,* 238 *N.J.Super.* 634, 637–38, 570 *A.*2d 495 (Law Div.1989); sleeping accommodations, *see Havurah v. Zoning Board of Appeals,* 177 *Conn.* 440, 418 *A.*2d 82, 87 (1979); a coffee house, *see Synod of Chesapeake, Inc. v. Newark,* 254 *A.*2d 611, 614 (Del.Ch.1969); or a drug-counseling center, *see Slevin v. Long Island Jewish Med. Ctr.,* 66 *Misc.*2d 312, 319 *N.Y.S.*2d 937, 945 (Sup.Ct.1971).

We conclude that the day care center proposed here is "customarily incidental" to the principal use of the subject property as a church. The proposal is in step with the prevailing view that a child day care center is an integral part of a church's ministry. Specifically, there was testimony that the proposed center will serve approximately sixty children. It will be operated by the Church and probably administered by a member of the congregation. Importantly, Pastor Boling explained that day care is but a single component of a bundle of community-related activities contemplated by the Church. As well as traditional worship services, a christian school, and the day care center, the Church plans a fellowship hall, health and parenting seminars, Lamaze classes, and job search and training. Each of these services will be offered to all members of the community. Pastor Boling explained that each activity, including day care, is consistent with the Church's fundamental purpose of serving the community at large. He testified, "[a]nd, so depending on what the resources our church has, we are hoping to just continue to offer as much as we can to the community we are in." The trial judge's determination that the day care center is an accessory use to the Church's primary use is both factually supported and legally sound.

We make one final observation about the accessory use issue. There has been some criticism of the "customarily incidental" standard in deciding whether a particular activity is an accessory use to a church. It has been suggested that, because of its imprecision in application and its focus on "normal" traditional religious practices, discrimination may be inherent in the "custom-

arily incidental" approach, thereby raising constitutional problems. Cordes, *supra*, 35 *U. Kan. L.Rev.* at 742. It is therefore proposed that:

> Resolution of accessory use issues, therefore, is better addressed by focusing on the actual problems posed by a particular activity rather than categorically prohibiting uses because they are not "normal." Such an approach would recognize a church's right to engage in activities related to its religious purpose or mission as long as the activity does not substantially interfere with surrounding uses. *The focus of inquiry should be on the impact a particular secondary use has on its surroundings. Although not a perfect solution, this approach strikes a better balance between the planning needs of a community and the religious activities of its churches.*
>
> [*Id.* at 743 (emphasis added).]

Applying this approach, the Board's determination is sustainable. The evidence is compelling that the proposed day care center, from a zoning prospective, is not incompatible with the surrounding uses or inimical to the general welfare. As noted, public and parochial schools and playgrounds are permitted uses in the R1.5 zone and each such use is harmonious with the day care center proposal. Moreover, the site plan for the Church and day care center was subject to vigorous studies and expert traffic review. The Board determined that all standards of the Township's site plan and land use ordinances, including safe and efficient traffic circulation, were met by the Church. Thus, there is no basis to conclude that the proposed day care center will "substantially interfere with surrounding uses." Cordes, *supra*, 35 *U. Kan. L.Rev.* at 743.

### III

Plaintiffs next contend that the approval of the Church's site plan was arbitrary, capricious and unreasonable because the Board failed to consider potential traffic problems which may be caused by vehicles using the Church facilities. They claim that the proposed entrance to the Church will create a dangerous "unregulated four-way intersection" with the entranceway to the shopping center across Washington Boulevard, and that Church

traffic will add to congestion at the nearby intersection of Washington Boulevard and Route 33.

A planning board's role in considering a site plan application is circumscribed. The object of site plan review is to assure compliance with the standards under the municipality's site plan and land use ordinances. Generally, the Board concerns itself with on-site conditions. *See N.J.S.A.* 40:55D–38, –39 and –41. *But see N.J.S.A.* 40:55D–42 (municipality may, by ordinance, require applicant to pay *pro-rata* share of off-site improvements necessitated by site plan). Thus, ordinarily, the denial of a site plan application would be a "drastic action" when the pertinent ordinance standards are met. Cox, *supra,* at § 15–10 at 289, *see also Dunkin' Donuts of New Jersey, Inc. v. Township of North Brunswick,* 193 *N.J.Super.* 513, 515, 475 *A.*2d 71 (App.Div.1984) (when applicant meets site plan ordinance standards, application may not be denied because of off-site conditions); *Lionel's Appliance Ctr., Inc. v. Citta,* 156 *N.J.Super.* 257, 269, 383 *A.*2d 773 (Law Div.1978) (same). While site plan review gives the Board wide discretion to assure compliance with the objectives and requirements of the site plan ordinance, "it 'was never intended to include the legislative or quasi-judicial power to prohibit a permitted use.'" *PRB Enter., Inc. v. South Brunswick Planning Board,* 105 *N.J.* 1, 7, 518 *A.*2d 1099 (1987) (quoting *Lionel's Appliance Ctr., Inc., supra,* 156 *N.J.Super.* at 264, 383 *A.*2d 773).

A planning board may, however, deny a site plan application if the ingress and egress proposed by the plan creates unsafe and inefficient vehicular circulation. *See N.J.S.A.* 40:55D–41b (the site plan ordinance shall include standards relating to "[s]afe and efficient vehicular and pedestrian circulation"). Here, the Church's traffic expert testified that he inspected the site, conducted traffic counts at the intersections in question, and concluded that the traffic design would not cause an adverse impact on the traffic flow in the area. It was his view that the proposed driveway access to the Church would operate at an acceptable

level, even considering the traffic generated at peak hours by religious services and the day care center.

As stated, the Board also consulted its own planners with regard to the potential impact on traffic. The Township's engineers and traffic consultants reviewed the traffic studies and "trip" counts, and assessed the safety of the entranceway to the Church facility. The Board considered alternative sites for the driveway, as well as traffic signals and other devices to regulate traffic flow. Ultimately, the Board determined that the proposed entranceway would provide safe and efficient vehicular circulation. However, it imposed a condition to the site plan approval requiring the Church to contribute to the cost of "signalization of the intersection of its property along Washington Boulevard if the same is required in the future," as well as hiring traffic control personnel, if necessary.

We are satisfied that the Board's determination was soundly grounded on the evidence adduced during the site plan hearing. *See Urban v. Planning Board*, 238 *N.J.Super.* 105, 111, 569 *A.2d* 275 (App.Div.1990), *aff'd as modified*, 124 *N.J.* 651, 592 *A.2d* 240 (1991). Notably, plaintiffs presented no expert testimony on the traffic issue. Even in the face of "diametrically opposed testimony," a municipal board " 'has the choice of accepting or rejecting the testimony of witnesses. Where reasonably made, such choice is conclusive on appeal.' " *Kramer v. Board of Adj.*, 45 *N.J.* 268, 288, 212 *A.2d* 153 (1965) (quoting *Reinauer Realty Corp. v. Nucera*, 59 *N.J.Super.* 189, 201, 157 *A.2d* 524 (App.Div.), *certif. denied*, 32 *N.J.* 347, 160 *A.2d* 845 (1960)); *see also Hawrylo v. Board of Adj.*, 249 *N.J.Super.* 568, 579, 592 *A.2d* 1236 (App.Div. 1991) ("[a] board is free to accept or to reject the opinions of a planner proffered by an applicant or objector"); *Allen v. Hopewell Tp.*, 227 *N.J.Super.* 574, 581, 548 *A.2d* 220 (App.Div.), *certif. denied*, 113 *N.J.* 655, 552 *A.2d* 177 (1988) (same). We have no reason to disturb the Board's determination, grounded on the expert testimony, and its ultimate determination that the proposed ingress and egress plan was safe and efficient.

## IV

We reject as without merit, plaintiffs' final claim that they were deprived of their due process right to a full and fair hearing before the Board. Plaintiffs were represented by counsel, at least during the second day of the proceedings, and were given full opportunity to present their case in opposition to the Church's proposal.

It is true that the Board chairman did not announce that objectors had the right to cross-examine witnesses presented by the Church. The "right of cross-examination shall be permitted to all interested parties through their attorneys, if represented," subject to control by the Board. *N.J.S.A.* 40:55D–10d. However, plaintiffs and their counsel expressed no interest in questioning the witnesses. Rather, their focus was on exacting a promise from the Church that it would not oppose any operation or future transfer of plaintiffs' liquor license.[4] Moreover, plaintiffs and their attorney had full opportunity to express their views during the entire hearing concerning the traffic safety issue and the worthiness of the opinions expressed by the Church's expert. We are therefore confident that the Board's failure to invite cross-examination was inconsequential.

Further, the Board correctly dismissed summarily plaintiffs' irrelevant claim that the Church's proposal should be rejected because of the Church's tax-exempt status. Finally, the chairman's refusal to keep the record open to allow unnecessary input from the Alcoholic Beverage Commission was a sound exercise of the Board's discretionary power. *See N.J.S.A.* 40:55D–10e. When plaintiff Shim persisted in his demand that the record remain open and began questioning the objectivity of the Board's attorney, the chairman properly closed the proceedings. While

---

[4] In fact, the Board ultimately made a finding in its resolution that the Church "has agreed" that it will do nothing to impair "plaintiffs' continued operation" of their liquor store "including any unreasonable or unfounded objection" to "a liquor license transfer."

objectors are entitled to be heard, "they should be kept orderly by the chairperson, and the chair may reasonably limit duplications of testimony or testimony as to irrelevant matters." Cox, *supra*, at § 27–3.4 at 454; *see also N.J.S.A.* 40:55D–10e.

Affirmed.