SAN-LAN BUILDERS, INC., A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT, v. WILLIAM H. BAXEN-.DALE, BUILDING INSPECTOR OF THE BOROUGH OF PALISADES PARK, AND THE MAYOR AND COUNCIL OF THE BOROUGH OF PALISADES PARK, A MUNICIPAL CORPORATION, DEFENDANTS-APPELLANTS.

Argued September 23, 1958—Decided November 3, 1958.

*Mr. Louis Eisenstein* argued the cause for appellants (*Messrs. Eisenstein & Eisenstein,* attorneys).

*Mr. Joseph M. Rotolo* argued the cause for respondent (*Mr. Peter S. Rotolo,* of counsel; *Messrs. Rotolo and Rotolo,* attorneys).

The opinion of the court was delivered by

HEHER, J. We certified for appeal, 27 *N. J.* 156, the Appellate Division's affirmance, April 4, 1958, of a judgment of the Law Division of the Superior Court entered September 23, 1957 directing the issuance of a permit for the erection on plaintiff's lands situate on the southwest corner of Broad Avenue and West Harwood Terrace in Palisades Park, New Jersey, in a "'B' Business" district delineated by the local zoning ordinance, of what is described in the complaint as "a five-story building consisting of 23 apartments with two stores on the first story," fronting on Broad Avenue, and in the stipulation of facts presented on plaintiff's motion for summary judgment as "the proposed apartment building."

The proceeding is in the nature of *mandamus* for the enforcement of what is deemed by the landowner to be its absolute right. The municipality maintains that the proposed building would not comply with the minimum side-yard and rear-yard setbacks and maximum lot-coverage re-

quirements for "apartment houses" under the zoning ordinance, then and now; and this, in turn, concerns the meaning of the particular regulation and the effect of two amendments of the ordinance, the first made August 13, 1957, just prior to the argument of plaintiff's motion for summary judgment, and the second on September 9, 1958, subsequent to our certification of the cause for appeal but before oral argument here.

The site has a frontage of 101 feet on the westerly side of Broad Avenue, "a depth of 110.99 feet on the southerly boundary line and a depth of 96.23 feet on the northerly boundary line which is the southerly line of West Harwood Terrace, and a width of 100 feet in the rear boundary line."

The essential facts follow: the "B" business district "extends westerly in depth the length of plaintiff's property"; there "is no existing one-family, or two-family, or group house, or garden-type apartment, or multiple family dwelling, adjacent to the south" of the plot; there is "only one other building on the same side of Broad Avenue, in the same block," a building "erected on the front property line of said street, so that no front-line setback would be required" for the planned structure under the Limiting Schedule of the ordinance; the lands to the west, on either side of West Harwood Terrace, are devoted to "one- and two-family" dwelling uses, and there is a one-family dwelling to the rear of the particular parcel; the building would not exceed in coverage 90% of the lot area, but would cover more than 50% of such area, and there would "not be a rear-yard setback of 25 feet nor aggregate side-yard setbacks of 20 feet."

These are the pertinent definitive clauses of the zoning ordinance of 1939, as amended:

Section 4:

"(6) 'Apartment House'—A dwelling designed for the use of more than eight (8) families and unlimited in size and occupancy except under the terms of this ordinance."

"(18) 'Dwelling'—Any building which is designed for or occupied in part or in whole as a house, residence, or sleeping place for one or more persons, either permanently or transiently."

The regulations and restrictions are embodied in section 5:

"(B) 'A' DISTRICTS—RESIDENCE:
"Within the districts designated as 'A' districts no building or area shall be used in whole or in part, and no dwelling shall be erected, altered or used except a single family dwelling, a two family dwelling, a multiple family dwelling, a group house, a garden-type apartment, or an apartment house, which dwelling shall conform to the requirements of the 'Limiting Schedule' annexed hereto and made a part hereof."

The Limiting Schedule to "A" follows:

"(a) Maximum building coverage of lot—50%;
(b) Minimum rear yard setback—25 feet;
(c) Minimum aggregate sideyard setbacks—20 feet."

Section 5 continues thus:

"(C) 'B' DISTRICTS—BUSINESS:
"Within the districts designated as 'B' districts no buildings or areas shall be used in whole or in part, and no building shall be erected, altered, remodeled or used, except a building for the purpose of trade or business, which building shall conform to the requirements of the 'Limiting Schedule' annexed hereto and made a part hereof.
"Property in 'B' districts may be used for any use permitted in 'AA' or 'A' districts.
"Where a building conforming to the requirements of a more restricted district is erected in a less restricted district, all the restrictions of the more restricted district shall apply.

\*      \*      \*      \*      \*      \*      \*      \*

"Nothing in this section shall be deemed to exclude the erection of a building containing a store or stores on the ground floor, with living quarters above the store, provided said living quarters shall not extend beyond four (4) stories above said store or stores."

By the amendment of August 13, 1957, all areas theretofore designated on the zoning map "as district 'A–Residential'" were reclassified as "district 'AA–One and Two Family Residential,' subject to all of the uses and restrictions thereof," except for certain areas therein continued "as 'A–Residential' districts."

And it was therein also provided, section 3:

"No apartment building in an 'A-Residential' district shall exceed two and one-half stories or thirty-five feet in height, and the Limiting Schedule contained in the Zoning Ordinance aforementioned, is hereby amended accordingly; provided, however, that such height limitation shall not be applicable to structures in B, C or D districts."

Under the Limiting Schedule to "B," a lot coverage of 90% is permissible for corner lots, and the building in view satisfies this condition.

The landowner's contention is that the proposed building "is not an 'apartment house'" within the intendment of the zoning ordinance of 1939, but rather a "'business district building' containing two stores on the ground floor with living quarters for twenty-three families above [the] stores," and such a building is permissible "in a 'B–Business' District" if erected "in accordance with the restrictions of the limiting schedule applicable to the 'B–Business' District," but "could not be erected in the more restricted districts of 'AA' and 'A'–Residential Districts" and it "therefore does not conform to the requirements of these more restricted districts and need not comply with the restrictions applicable to such more restricted districts"; and that the amendment of the ordinance adopted August 13, 1957, before the entry of the Law Division's judgment, sanctions such a building in a "B" business district and "the requirements of the limiting schedule for" the business district would apply.

It is the insistence of the municipality that the "proposed apartment building" is "'a building conforming to the requirements of a more restricted district' as that term is used in the [original ordinance of 1939], and must therefore comply with the rear and side yard and lot coverage restrictions for apartment houses established by the Limiting Schedule of the ordinance"; and neither the "final paragraph" of section 5(C) of the ordinance nor the amendment of August 13, 1957 relieves plaintiff of the duty of compliance with these "restrictions applicable to apartment houses."

The holding of the Appellate Division was that "a five story [apartment] building with stores on the first level" is permissible in a "B" business district under the last paragraph of section 5, subject to the "business district limitations with which [the] plaintiff is admittedly in conformity"; that under the zoning amendment of August 13, 1957, effective prior to the argument in the Law Division of the motion for judgment, "apartments exceeding 2½ stories in height were forthwith rendered not permissible in an 'A-Residential' zone, referred to above as '(B) "A" Districts Residence,'" provided "that such height limitations shall not be applicable to structures in B, C or D districts"; that "while [the] litigation was pending," the local governing body "did not eliminate the doubt of the [last] paragraph" of section 5, *supra;* and that if it had been repealed, plaintiff "would have no basis for appeal," citing *Roselle v. Moonachie,* 48 *N. J. Super.* 17 (*App. Div.* 1957), same case after reargument, 49 *N. J. Super.* 35 (*App. Div.* 1958), and thus it is not requisite that the building "comply with the requirements of the more restricted district in which it is permitted * * *."

██ These regulations are to receive a reasonable construction and application, to serve the plan and course of action of the lawgiver; and in this quest for the true intention of the law, the letter gives way to the obvious reason and spirit of the expression, and to this end the evident policy and purpose of the act constitute an implied limitation on the sense of general terms and a touchstone for the expansion of narrower terms. The will of the lawgiver is to be gathered from the object and nature of the subject matter, the contextual setting, and the mischief felt and the remedy in view. Scholastic strictness is to be avoided in the search for the legislative intention. The particular terms are to be made responsive to the essential principle of the law. It is not the words but the internal sense of the act that controls. Reason is the soul of law. *Wright v. Vogt,* 7 *N. J.* 1 (1951).

■ The sense of the regulations under review, taken and compared together, is that the uses allowable in "AA" and "A" districts are also permissible in less restricted districts but subject to all the restrictions governing such uses in the more restricted district. The limitations upon a building use in the more restricted district inhere in the selfsame use in the less restricted district. Where a building "conforming to the requirements of a more restricted district is erected in a less restricted district, all the restrictions of the more restricted district shall apply," as a quality inseparable from the use itself. But ground-floor business use would not render the proposed building "non-conforming" within the intendment of this provision. The building would still be an "apartment house" within the meaning of the ordinance, a "dwelling designed for the use of more than eight families." When the intrinsic reason of the regulations is considered, it would be an arbitrary construction, a slavish adherence to literalism, to hold that these restrictions, primarily related as they are to habitation and the attendant socio-economic needs, are inapplicable to apartment houses in a "B" district merely because of a business use on the first floor, but are altogether suitable and proper for apartment houses in a business district devoid of such business use. There is no conceivable basis for such a distinction. The building would be an apartment house regardless of the two ground-floor stores; the basic need would be the same, and it would do violence to reason and logic to hold that the lawmakers intended to apply the limitations in the one case but not in the other. By the terms of the ordinance itself, an "apartment house" is a multiple "dwelling"; and a "dwelling" is "any building * * * designed or occupied in part or in whole as a house, residence, or sleeping place for one or more persons, either permanently or transiently." The building here would be a dwelling "in part." And the phrase "conforming to the requirements of a more restricted district" has reference to the "use" permissible in "AA" or "A" residence districts

under the immediately preceding sentence. Such use is subject to all the restrictions of the more restricted district.

The final paragraph of section 5, if it be deemed applicable only to subsection (C) rather than the whole of section 5, permits the erection of a building in a "B" business district for ground-level store use and apartment use limited to four stories above the first floor stores. It would seem that this was added from an abundance of caution. It is not concerned with the "bulk" controls provided for apartment houses in the Limiting Schedule of the ordinance.

The amendment of August 13, 1957 limited apartment buildings in an "A" residential district to $2\frac{1}{2}$ stories, or 35 feet in height, and the Limiting Schedule was amended accordingly, provided, however, that such height restrictions should not apply to structures in "B," "C" or "D" districts. But the apartment-house use thus provided for "B" districts was otherwise subject to the limitations laid on such use in the more restricted district; and this, on grounds of policy outstanding in the ordinance itself. The zoning process involves an exercise of the police power to regulate the size of buildings and other structures, the percentage of lots that may be so used, the size of yards, courts and other open spaces, the density of population, and the location and use and extent of use of buildings and structures and lands for residence, trade, industry and other purposes, and thus to secure the public health, safety, morals and welfare by means of adequate light and air, the avoidance of overcrowding of land and buildings and the undue concentration of population; these among other considerations related to the essential common good, the basic principle of civilized society.

All this is of the very essence of our constitutional and statutory zoning principle. 1947 *Constitution, Art.* IV, *Sec.* VI, *par.* 2; *R. S.* 40:55–30, as amended by *L.* 1948, *c.* 305; 40:55–32.

The ordinance is expressed to be, section 1, an exercise of the statutorily declared power to these particular ends. The controls directed to "daylighting of buildings" and

"open space around buildings for rest and recreation" are far more extensive for residence use than for business alone; and therein lies the ruling principle of the regulations.

The maximum building coverage of lots is 50% for apartment houses and 40% for all other residence structures, but 75% for a business building on an interior lot and 90% for a business building on a corner lot. And the minimum rear-yard depth is 25 feet for a residence structure and 15 feet for a business building. The minimum aggregate width of side yards is 14 feet for one- and two-family houses, 16 feet for group houses, garden-type apartments, and multiple-family dwellings, and 20 feet for apartment houses. And no side yards are required for business buildings unless "constructed adjacent to an existing one-family, two-family, group house, garden-type apartment dwelling or multiple family dwelling," in which case "a minimum side yard of not less than 10 feet wide shall be provided on the side adjacent to such dwelling," but "no side yard whatsoever need be provided if such business * * * building adjacent to a dwelling as aforesaid shall be of fireproof construction."

■ And to effectuate the basic design, the ordinance prescribes bulk controls for residence structures whether they be located in a residence, business or industrial district. Such is the rationale of the direction of section 5 that the requirements of the more restricted district shall apply where a building "conforming" to such limitations is erected in a less restricted district.

■ Zoning ordinances, in general, "operate in two different ways. They regulate the use to which land is put, and they control the bulk of buildings, $i.$ $e.,$ the size, shape, and placement of buildings on the land. * * * Bulk controls are used to achieve three similar ends: control over density of population in living and working areas, adequate daylighting of buildings, and sufficient open space around buildings for rest and recreation. Population density control is aimed at solving some of the problems of congestion," striking as it does "at the root of the traffic problem by preventing overconcentration," furnishing "a sound basis for planning

municipal services such as schools, sewers, and transportation lines," and providing "the basic tool for organizing commercial and residential areas in more nearly self-contained neighborhoods"; "[d]aylighting of buildings and open space provisions are supplementary to density controls but no less vital, for they are also aimed at increasing the amenity of city life and, correlated with density controls, at the abolition of blighted areas." 60 *Yale L. J.* 506, 507–8 (1951). And see Toll's *"Zoning for Amenities,"* 20 *Law and Contemporary Problems* 266 (1955), where the writer offers cogent reasons for the wider employment of the usable open space technique as a means of serving basic zoning principle.

Moreover, by the amendment of the ordinance made September 9, 1958, after our certification of the cause for appeal but before oral argument was had, the last paragraph of section 5 was exscinded; and thus plaintiff's argument would be untenable even though the contrary intendment be accepted. Conceding that the repealer would be effective here had it been adopted prior to our certification of the appeal, it is now contended, contrary to the position taken on the brief, that this action "does not change the zoning ordinance in substance and the ordinance as [so] amended" does not bar the proposed structure in the "B" district. The repealer was designed to remove all doubt as to the meaning of the ordinance in this regard, and it is to be considered as such. There is no ground *contra,* by way of estoppel *in pais* or otherwise. *Socony-Vacuum Oil Co. v. Mount Holly Township,* 135 *N. J. L.* 112 (*Sup. Ct.* 1947); *Westinghouse Electric Corporation v. United Electrical, Radio and Machine Workers of America, Local No.* 410, 139 *N. J. Eq.* 97 (*E. & A.* 1946); *Borough of Little Ferry v. Bergen County Sewer Authority,* 9 *N. J.* 536 (1952).

The judgment is accordingly reversed; and the cause is remanded with direction to dismiss the complaint.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For affirmance*—Justice WACHENFELD—1.