STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. MICHAEL COPPOLLA, TINO FIUMARA, LAWRENCE RICCI, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 27, 1981—Decided December 10, 1981.

Before Judges MICHELS, McELROY and J. H. COLEMAN.

*John K. Enright*, Deputy Attorney General, argued the cause for appellant (*James R. Zazzali*, Attorney General of New Jersey, attorney).

*William T. Petrina* argued the cause for respondent Michael Coppolla (*Miles Feinstein* attorney, filed a statement in lieu of brief).

*Michael Critchley* argued the cause for respondent Tino Fiumara (*Critchley & Roche*, attorneys, filed a statement in lieu of brief).

*Thomas J. Cammarata* argued the cause for respondent Lawrence Ricci (*Shaljian, Cammarata & O'Connor*, attorneys).

The opinion of the court was delivered by

McELROY, J. A. D.

Defendants Fiumara, Coppolla and Ricci were convicted of federal crimes and were, respectively, incarcerated in federal correctional institutions at Leavenworth, Kansas; Ashland, Kentucky and Danbury, Connecticut. Fiumara is serving 25 years. Coppolla has a 13-year sentence and Ricci was sentenced to a three-year term. Pursuant to the Interstate Agreement on Detainers Act, *N.J.S.A.* 2A:159A–1 to 15 (agreement), they were brought to this State to answer an indictment returned by the state grand jury charging them with conspiracy to violate this State's antitrust act, *N.J.S.A.* 56:9–3. and were housed in the State Prison at Trenton. The decision to so house them appears to have been made by the New Jersey Department of Corrections.

Defendants moved before the trial court for an order transferring them from State Prison to the Somerset County Jail while awaiting trial. The State and the Somerset County Sheriff opposed this motion. The court interpreted Article V of the agreement (*N.J.S.A.* 2A:159A–5(d)) as requiring the State to place defendants in the Somerset County Jail or any other county correctional institution selected by the State but located within one hour's travel time from the Somerset County Courthouse where the trial of the New Jersey indictment would be held.

The State sought leave to appeal to this court and a stay of the order entered in the Law Division. We granted leave to appeal and a stay conditioned upon the right of counsel for defendants, on 24 hours' notice, to have reasonable access for

consultation and preparation of a defense with their respective clients and, in view of the conspiracy charges, the same degree of access to the other detainees imprisoned on the pending indictment.

The matter requires interpretation of *N.J.S.A.* 2A:159A–5(d) which, in pertinent part, provides:

> Except for his attendance at court and while being transported to or from any place at which his presence may be required, the prisoner shall be held in a suitable jail or other facility regularly used for persons awaiting prosecution.

The issue is one of first impression. Neither our research nor that of the parties has found that any court of the signatory governments has dealt with this section.

Defendants contend, and the trial judge, in an oral bench decision, agreed that this section mandates that defendants be housed at a county correctional institution. The judge reasoned that the words of the section "are clear and unambiguous and plainly require that defendants brought into the state pursuant to the detainers be held in a facility regularly used for persons awaiting prosecution." He further reasoned that Trenton State Prison is utilized for the housing of convicts sentenced to a term of imprisonment for a term of one year or more, citing *N.J.S.A.* 30:4–136 and *N.J.S.A.* 2C:43–10(c). The judge concluded that the State had failed to show "that the Trenton State prison is a facility regularly used for the confinement of persons awaiting prosecution."

On our view of the matter this was too literal an interpretation of the wording used in *N.J.S.A.* 2A:159A–5(d). The applicable principles of construction are stated in *N.J. Builders, etc., Ass'n v. Blair*, 60 *N.J.* 330 (1972):

> In reading and interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted. Where a literal rendering will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter. This doctrine permeates our case law.
>
> "When all is said and done, the matter of statutory construction . . . will not justly turn on literalisms, technisms or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation. [*Jersey City Chapter Prop. Owner's, etc., Assoc. v. City Council*, 55 *N.J.* 86, 100 (1969)]

[T]he spirit of the legislative direction prevails over its terms. [*Dvorkin v. Dover Tp.*, 29 *N.J.* 303, 315 (1959)]"

In reviewing certain municipal legislation Justice Heher, in *San-Lan Builders, Inc. v. Baxendale*, 28 *N.J.* 148, 155 (1958), observed:

"These regulations are to receive a reasonable construction and application, to serve the plan and course of action of the lawgiver; and in this quest for the true intention of the law, the letter gives way to the obvious reason and spirit of the expression, and to this end the evident policy and purpose of the act constitute an implied limitation on the sense of general terms and a touchstone for the expansion of narrower terms. The will of the lawgiver is to be gathered from the object and nature of the subject matter, the contextual setting, and the mischief felt and the remedy in view. Scholastic strictness is to be avoided in the search for the legislative intention. *The particular terms are to be made responsive to the essential principle of the law. It is not the words but the internal sense of the act that controls.* Reason is the soul of law. [Emphasis supplied]"

In an earlier case the same Justice said,

"The intention emerges from the spirit and policy of the statute rather than the literal sense of particular terms. [*Caputo v. The Best Foods*, 17 *N.J.* 259, 264 (1955)]

Moreover, we think it fair to assume that the need for such a rule as we are here considering probably did not occur to the draftsman of the Law Against Discrimination; and furthermore we think it fair to entertain the belief that had such a need been foreseen, appropriate provision for such a rule would have been forthcoming. The emergence after enactment of problems and situations not anticipated by the legislative imagination calls upon the judiciary for a sympathetic response consonant with what one may presume the legislature would have said had it indeed spoken." [at 338–339]

In the same vein the Supreme Court, in *Morss v. Forbes*, 24 *N.J.* 341 (1957), observed:

On many occasions the sense or spirit of a statute will prevail over the literal logical, grammatical meaning of the words, if the latter is not in accordance with reason or the principal design of the statute. The most recent expression of the liberal judicial attitude which strives to avoid a narrow, pedantic construction in accordance with the empty principles of rhetoric alone may be found in *Lane v. Holderman*, 23 *N.J.* 304 (1957). *See also DeFazio v. Haven Savings & Loan Ass'n*, 22 *N.J.* 511, 518 (1956); *In re Roche's Estate*, 16 *N.J.* 579, 587 (1954).

The statute in question is a solemn agreement between the states and the Federal Government to not only expedite the orderly disposition of pending charges and detainers but to provide cooperative procedures for such purpose. *N.J.S.A.* 2A:159A–1. Its advantages inure to the benefit of not only prisoners, who thereby obtain speedy disposition of pending charges, but insures that the receiving state will obtain custody

of an indicted person and thus avoid the lengthy delay that might make conviction difficult or impossible. There is, however, another party whose interests are equally to be considered, the sending state or, as here, the Federal Government. The custody of the receiving state is but temporary (*N.J.S.A.* 2A:159A–5(a)) and the agreement requires that at "the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned . . . ." *N.J.S.A.* 2A:159A–5(e). Subsection (g) of the same section states, in a general sense, "the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending State" and any escape from temporary custody may be dealt with "as an escape from the original place of imprisonment." Subsection (h) makes the receiving state "responsible for the prisoner" in addition to requiring the receiving state to pay all costs of transporting, caring for, keeping and returning the prisoner. All of the foregoing evinces a legislative intent that the cooperation, temporary custody, responsibility and the obligation to return the prisoner lodged in the receiving state be exercised with an awareness that those received are not merely unconvicted persons awaiting prosecution but are, in reality and so designated by the agreement, convicted "prisoners" of the sending government. This awareness of responsibility we deem to be a fundamental, essential purpose and a part of the spirit of this enactment granting concurrent but temporary custody to a receiving state. It is in this context that the phrase "*suitable* jail *or* other facility regularly used for persons awaiting prosecution" (emphasis ours) must be viewed.

 We do not conceive that the phrasing of § 5(d) intends that persons already convicted and serving sentences at Leavenworth, Ashland and Danbury are necessarily to be housed in a county institution. The use of the word "suitable" implies a discretion in the receiving custodial officer, here the Commissioner of Corrections, to determine suitable housing for the purpose of temporary custody. A similar grant of such discretion appears in *N.J.S.A.* 2A:159A–5(a), which provides:

In the case of a Federal prisoner, the appropriate authority in the receiving State shall be entitled to temporary custody as provided by this agreement or to the prisoner's presence in Federal custody at the place for trial, whichever custodial arrangement may be approved by the custodian.

Housing in a nearby federal institution is not urged by defendant, and it would appear, in any event, to be less than practicable. It is clear that this act does vest discretion in the receiving state's custodial officer as to what is suitable. In this context consideration that *N.J.S.A.* 30:4–136 and *N.J.S.A.* 2C:43–10 should dictate prisoner housing because defendants are not under any present state sentence is, in our view, meaningless, and we reject defendants' contention that these statutes were intended by the Legislature, in these circumstances, to govern the determination of suitable placement of persons already convicted of federal crimes. The discretion to which we allude requires that the custodial officer of the receiving state use reasonable judgment to determine, in the interests of the sending state or federal forwarder, and his reciprocal responsibility thereto, whether a particular prisoner be placed in a suitable jail or, in the alternative, an "other facility regularly used for persons awaiting prosecution." That administrative judgment calls for the exercise of the Commissioner's expertise and involves weighing the type and security of the institutions available, the nature of the prisoner, the crime of which he was convicted, the length of sentence being served and the type of institution from which he was received. On this record, and under the affidavits filed, all three defendants were serving sentences not ordinarily served in county correctional institutions and were serving them in federal institutions unlike any of our county correctional facilities. We cannot, in these circumstances, say that the Commissioner abused his statutory discretion and that his decision in this matter was arbitrary, capricious or unreasonable. *Cf. Mayflower Securities v. Bureau of Securities*, 64 *N.J.* 85, 93 (1973).

Defendants urge this court's decision in *State v. West*, 79 *N.J.Super.* 379, 384 (App.Div.1963), for the proposition that the

agreement is remedial in character and "should be construed liberally in favor of the prisoner." We do not regard that passing observation in *West* as declaring that this court should ignore the clear intent and spirit of this enactment merely because defendants would rather be in a county facility. The prior order of this court, dated August 18, 1981, directing that counsel for defendants have reasonable access to defendants at State Prison is continued for the period during which defendants are present in New Jersey and until they are returned to federal custody. In this manner the purposes of the agreement which safeguard defendants' right to consult with counsel and their right to speedy trial remain unimpaired. *See United States v. Sorrell*, 562 *F*.2d 227, 232 (3 Cir. 1977), *cert. den.* 436 *U.S.* 949, 98 *S.Ct.* 2858, 56 *L.Ed*.2d 793 (1978).

By reason of our disposition of this matter, we see no purpose in discussing the State's contention that the decision of the Law Division was improper as not within that court's jurisdiction. *See however, R.* 2:2–3(a)(2); *Pascucci v. Vagott*, 71 *N.J.* 40, 53 (1976).

The order entered below granting the motion of defendants is reversed.