217 N.J. Super. 56 (1987)
524 A.2d 1283
MARKET STREET MISSION, PETITIONER-APPELLANT,
v.
BUREAU OF ROOMING AND BOARDING HOUSE STANDARDS, DEPARTMENT OF COMMUNITY AFFAIRS, STATE OF NEW JERSEY, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted November 19, 1986.
Decided April 23, 1987.
*58 Before Judges KING, DEIGHAN and MUIR.
Rand, Algeier, Tosti, Woodruff & Frieze, attorneys for appellant (Gary C. Algeier of counsel; Leonard J. Artigliere, on the brief).
W. Cary Edwards, Attorney General of New Jersey, attorney for respondent (John J. Chernoski, Deputy Attorney General, on the brief).
The opinion of the court was delivered by DEIGHAN, J.A.D.
On this appeal we are required to determine whether the Rooming and Boarding House Act, N.J.S.A. 55:13B-1 et seq., applies to petitioner, a religious rescue mission in Morristown which provides, free of charge, food, shelter, and therapeutic programs for recovering alcoholics and drug addicts. The Commissioner of the Department of Community Affairs (Commissioner) held that the Act was intended to include non-commercial multiple residences such as that operated by Market Street Mission as boarding houses. For reasons stated below, we reverse.
In January 1984 the Bureau of Rooming and Boarding House Standards (Bureau) an agency within the Department of Community Affairs (Department), inspected the Market Street Mission (Mission) in Morristown. As a result of its inspection, the Bureau issued a report noting a series of fire hazards in violation of Department regulations. The Commissioner ordered that violations be abated by March 9, 1984. Upon reinspection on March 12, 1984, the Bureau found that the Mission had not abated the cited violations. Consequently, the Commissioner assessed a penalty of $250 for each of 12 violations, and $50 for another violation, for a total penalty of $3,050. The *59 Mission filed an administrative appeal challenging the Bureau's jurisdiction and the Act's applicability to a nonprofit, religious corporation such as the Mission.
The matter was assigned to an Administrative Law Judge (ALJ) as a contested case. On January 12, 1985, subsequent to a hearing, the ALJ issued his decision determining that: (1) he had no jurisdiction to determine the constitutionality of the statute and regulations involved; (2) the statute and regulations are not unconstitutional as applied to the Mission; (3) religious institutions are subject to police powers of the State when related to the safety and welfare of the public; (4) the application of N.J.S.A. 55:13B-1 et seq. to the Mission is not an interference with nor prohibited by the free exercise of religion and (5) the penalty imposed was reasonable.
The Commissioner adopted the ALJ's decision but modified it by waiving the penalty on the condition that "within 30 days of receipt of this decision, the petitioner files an application for licensure, enters into an agreement with the Bureau to establish a schedule for the abatement of all violations and proceeds diligently to abate all violations directly related to life safety." The Mission did not accept the Commissioner's conditions and appealed to this court. We granted the Mission's motion to supplement the record with affidavits from employees and one resident concerning the Mission's purpose and programs and the effect of the Act as precluding the existence of the Mission.

I
The facts, many of which were stipulated before the ALJ, are substantially undisputed. The Mission was established 97 years ago and in 1933 was incorporated as a nonprofit corporation. Its purpose as stated in the certificate of incorporation is to foster
the spiritual, mental, moral and physical improvement of men, women and children by conducting a gospel rescue Mission ... to minister to the spiritual, moral, mental and physical needs of men, women and children, by the proclamation of the message of God's Saving Grace through the sacrificial and redemptive *60 work of the Lord Jesus Christ on the Cross and by supplying food, shelter, clothing and other necessary comforts to the poor and needy.
The Mission is tax exempt under the Internal Revenue Code. It is funded partially through profits from a thrift store which is manned by its beneficiaries. The remainder of its funds are donations from churches and individuals. No money is received from the State or Federal government.
The Mission is located in a three-story brick building in Morristown, containing sleeping and living facilities for about 50 residents who are housed in bedrooms in the basement, second and third floors.
It is a religious organization devoted, in part, to spreading the gospel to the underprivileged and others rejected by society. It is the Mission's belief that man's social problems and handicaps can be treated by attending to his spiritual, moral, mental, and physical needs. The beneficiaries of the Mission are persons who reside and eat at the premises, who are socially troubled, and who attend a program of rehabilitation which includes spiritual counselling and work therapy to overcome their social handicaps. The Mission, through its staff and volunteers, attempts to rehabilitate these individuals by attending to their physical, social, and spiritual needs.
The principle function of the Mission is the rehabilitation of alcoholics and in some instances drug addicts. Its clients are unemployed, homeless "street" persons, most of whom have no income. Upon entering the Mission, a beneficiary is required to live on the premises and to remain for an initial 90-day program. As a condition of residency, each beneficiary is required to comply with certain rules which require inter alia: attendance at daily chapel services and at least three bible classes a week; abstinence from alcoholic beverages, and participation in the Mission's theraputic program. The beneficiaries are not paid for their services because the work requirement is a part of the therapy program to restore their confidence and self assurance. Food, shelter and clothing are provided to the beneficiaries at no cost. There are no leases or any type of *61 agreements with the beneficiaries to pay any rent or consideration for shelter. In any event, most beneficiaries have no source of income and would be unable to pay for food, shelter or clothing.
The Mission presented testimony and affidavits of its staff members and a resident. At the hearing the executive director of the Mission explained the Mission's philosophy:
Our philosophy is that there are many individuals who are in need of help in their lives and we believe the christian gospel is the way to, to answer that need. Since its inception almost ninety six years ago this has been the basic philosophy of the mission. We do have mostly men who have been addicted to strong drink, occasionally we get some ... addicted to other types of drugs, but generally speaking people that come to us have had their lives somewhat ruined by the abuse of alcohol, and our philosophy is that by preaching of, of the word, teaching of the word of God, the Bible, we can help people to, to overcome this particular problem that they have in their lives and hopefully restore them as useful citizens of society.
On this appeal the Mission raises the following issues: (1) the Legislature did not intend to include the Mission within the purview of the Rooming and Boarding House Act; (2) as applied to the Mission, the Act and regulations impose impermissible burdens on the free exercise of religion; (3) application of the Act to the Mission would excessively and impermissibly entangle the State in religious affairs, and (4) the Act and the bureau's administration of the Act violate equal protection guarantees.

II
The Mission first contends that the Rooming and Boarding House Act of 1979, N.J.S.A. 55:13B-1 et seq., by its terms does not, nor is it intended to, apply to non-profit, religious institutions such as the Mission. Consequently, the Mission concludes that the Bureau has no jurisdiction over it. In essence, the Mission contends that the Act is applicable only to commercial boarding houses and not charitable non-profit organizations. Accordingly, it is necessary to analyze the Act, its purpose and history to determine its applicability to the objectives and activities of the mission.
*62 The purpose of the Rooming and Boarding House Act of 1979, N.J.S.A. 55:13B-1 et seq., in part, is to provide "for the health, safety and welfare of all those who reside in the rooming and boarding houses." N.J.S.A. 55:13B-2. The Act also aims to protect the interests of the boarding home industry and to encourage them "to remain in the business". Summary, Statement to Senate, No. 3111, Senate Institutions, Health and Welfare Committee at 2-3. Excluded from the Act are foster homes, community residences for the developmentally disabled, dormitories owned or operated by non-profit institutions of primary, secondary, or higher education used by students and facilities occupied exclusively by full-time students. N.J.S.A. 55:13B-3a. Also excluded from the scope of the Act, effective November 12, 1985, are premises owned or operated by a non-profit or religious corporation or association in which an owner-occupied one-family dwelling is made available to not more than six guests for charitable purposes and where the owner derives no income from the use of the premises. N.J.S.A. 55:13B-3a L. 1985, c. 364, § 1.[1]
The Act was adopted in response to the Legislature's perception that residents of unregulated boarding houses in New Jersey were being endangered by unsafe facilities, inadequate services, and greedy, dishonest owners. Gordon and Lazarus, "New Jersey's Rooming and Boarding House Act: Its Effects and Effectiveness," 12 Seton Hall L.Rev. 484 (1982). One of the Act's main premises is that the residents of such homes "are predominantly elderly, disabled and poor," and are thereby in special need of protection by the State. N.J.S.A. 55:13B-2.
*63 The Act empowers the Commissioner of the Department to promulgate regulations and establish safety, security, service, living, and record-keeping standards for rooming and boarding houses; suspend or revoke licenses; inspect any rooming and boarding house without prior notice; review facility records; establish standards for the construction and conversion of facilities; issue subpoenas compelling attendance and the production of documents at hearings, and enforce the provisions of the Act through administrative and judicial proceedings. N.J.S.A. 55:13B-4. In addition, the Act directs the Commissioner to establish standards ensuring that all rooming and boarding houses are operated and constructed in a manner that will "protect the health, safety and welfare of its residents and at the same time preserve and promote a homelike atmosphere." N.J.S.A. 55:13B-6.[2]
As a supplement to the Act, the Legislature enacted a Boarding Facility's Bill of Rights. N.J.S.A. 55:13B-18 to 21. This statute sets forth 15 rights of every resident of rooming houses, boarding houses, and residential health care facilities. It provides that upon admission to any facility, the owner shall supply the resident with a copy of the rights listed in the Act. N.J.S.A. 55:13B-20. The law also provides a private right of action for residents whose rights have been violated. If the resident prevails in this action, he is entitled to recovery of attorneys' fees and costs. N.J.S.A. 55:13B-21.

*64 III
The Mission does not deny that it is within the literal classification of a boarding house as defined in N.J.S.A. 55:13B-3a, but asserts that beyond its literal terms, the Act is to encompass "only commercially operated boarding houses where an operator seeking profits might abuse (mentally, financially and emotionally) the residents of such homes." It notes that the Mission charges no rent and is "a self-contained religious community" which depends upon residents' willingness to participate in religious services and instruction. Further, the Mission points to N.J.S.A. 55:13B-19n, which allows residents "to practice the religion of [their] choice or to abstain from religious practices." It argues that this requirement is incompatible with the Mission's purpose which requires residents to participate in the Mission's religious and "therapeutic work program" without pay, "as part of its program to restore a person's self-image." The Mission also finds patent incompatibilities in the record-keeping and monitoring powers of the bureau. For example, under N.J.A.C. 5:27-3.2 the bureau may review the "house rules" and void those it deems "unreasonable." The Mission contends that "requiring a religious institution to maintain records of its expenditures for inspection by the State would clearly violate the First Amendment, as would extending the power of the State to determine whether a religious institutions [sic] rules are `reasonable'".
The Mission further notes that the regulations permit a resident to be evicted only under the procedures mandated by the Anti-Eviction Act, N.J.S.A. 2A:18-61.1 et seq., which governs landlord-tenant relations. N.J.A.C. 5:27-3.3(c). Because of this requirement, the Mission proposes that the Act is intended to apply only where residents pay rent in return for the services provided.
For all of these reasons the Mission concludes that the Act is irreconcilable with charitable non-profit religious institutions such as that maintained by the Mission. It reasons that the Act *65 could not possibly have been intended to include the purposes and objectives of the Mission within the literal meaning of the statute.

IV
In interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted. N.J. Builders, Owners & Managers Association v. Blair, 60 N.J. 330, 338 (1972). Where a literal reading will lead to a result not in accord with the essential purpose and design of the Act the spirit of the law will control over the letter of the law. Ibid. The meaning of the statute is to be gathered from the object and nature of the subject matter, the contextual setting, and the mischief sought to be eliminated as well as the proposed remedy. Brewer v. Porch, 53 N.J. 167, 174 (1969); San-Lan Builders, Inc. v. Baxendale, 28 N.J. 148, 155 (1958). It is not the words but the internal sense of the Act that controls; reason being the soul of the law. Ibid. In this respect, policy consideration is the key to interpretation as to the purpose, equity or spirit of the statute. In re Roche, 16 N.J. 579 (1954).
The legislative history of an Act and contemporaneous construction of other laws pertaining to similar subject matter may furnish important light as to the purpose and plan of the legislature. N.J. Pharmaceutical Ass'n. v. Furman, 33 N.J. 121, 130 (1960); Key Agency v. Continental Cas. Co., 31 N.J. 98, 103 (1959). Statements appended to Bills are useful aids to ascertain legislative intent, Howard Savings Inst. v. Kielb, 38 N.J. 186, 195 (1962), as are reports and comparable documents evidencing legislative purpose. Dumont Lowden, Inc. v. Hansen, 38 N.J. 49, 56 (1962).
When the natural or literal meaning of statutory language embraces applications which would not serve the policy or purpose for which the statute was enacted or help to remedy the mischief at which it was aimed, the courts may construe it *66 restrictively in order not to give it an effect beyond its equity or spirit. 2A Sutherland Stat. Const (4th ed. 1984) ¶ 54.06 at 582 citing De Fazio v. Haven Savings & Loan Ass'n., 22 N.J. 511 (1956). Where there is doubt as to the extent of inclusiveness of a statute, it will be construed to apply only so far as is needed to remedy the perceived mischief. 2A Sutherland, supra § 54.04 at 570, citing State v. K-Mart, 134 N.J. Super. 76 (Cty.Ct. 1975), aff'd, 141 N.J. Super. 546 (App.Div. 1976). If the literal import of the text of an act is inconsistent with the legislative meaning, the words of the statute will be modified to agree with the intent of the Legislature. 2A Sutherland, § 46.07 at 110, citing Restaurant Enterprises, Inc. v. Sussex Mutual Ins. Co., 52 N.J. 73 (1968).
In view of the foregoing principles of construction and interpretation of statutes, it is necessary to reassess and analyze the purpose, plan, history and remedy of the Act. The Statement to Senate Bill No. 3111, supra, recites some general purposes of the Act. As noted earlier, the Act provides "for the health, safety and welfare of persons residing in rooming and boarding houses." The Statement also expresses interest in the boarding room "industry" and notes that the Act seeks to avoid "misguided legislation and burdensome rules [which may] force boarding home owners to close up and try some other business." Id. at 2 (emphasis supplied). It notes that "the Committee has tried to make sure that there will be sufficient incentives for rooming houses ... to stay in business and even grow in number," particularly those "facilities run by small-time owners who manage to maintain warm, family-like residences." Id. at 3. (emphasis supplied).
The focus of the Act, obviously, is upon commercial enterprises with no reference to charitable non-profit organizations which are concerned solely with rehabilitation of homeless and socially troubled individuals through spiritual counselling and work programs. At public hearings concerning the problems of Boarding and Rooming houses, there was no mention made or consideration given to religious missions or other homes where *67 the beneficiaries do not pay for the services. See Public Hearing Before the N.J. Senate Committee on Institutions, Health and Welfare on Recommendations to Curb Boarding House Problems and Abuses (July, 1978).
The Report of the Commissioner of Health's Advisory Committee on Boarding Homes (February 1978) was concerned with the following problems requiring legislation: "overcrowding, filthy rooms, lack of fire escapes and other safety equipment, faulty wiring, non-existent or inadequate food service, and fraudulent use of residents' funds." Id. at 27. Further, it listed the two principal funding sources for boarding homes: (1) "private paying individuals' and (2) public funded residents, who pay via SSI and Medicaid." Id. at 22. Charitable organizations such as the Mission are not funded through either source.
The Report and Recommendations of the State of New Jersey Commission of Investigation on Abuses and Irregularities in New Jersey's Boarding Home Industry (November 1978) (SCI Report) expressed a concern "for the human beings who are being victimized by the system. These are the boarding home residents whose personal misfortunes have made them particularly vulnerable to exploitation by certain boarding home operators." Id. at 8. The SCI Report "revealed an insensitivity on the part of many in the industry to the most elementary personal needs of the occupants of these facilities." Id. at 9. Certainly the Mission has not "victimized", "exploited" nor has it been "insensitive" to the personal needs of its residents. On the contrary, it has donated its services, food, shelter and clothing to its beneficiaries without charge with a view to rehabilitation.
The SCI Report concluded that
[o]nly under adequate governmental supervision and surveillance can a proper balance be achieved between the legitimate profit motivations of boarding home operators and their equally essential obligations to serve the more fragile boarders among their clientele. [Id. at 228; emphasis supplied].
*68 The Mission has no "profit motivations" and it is eminently aware of its "essential obligation" to the underprivileged and homeless persons rejected by society. The Mission undertakes to fill a gap in the needs of society to care for those unfortunate persons who are homeless, without friends or relatives and to rehabilitate a class of socially handicapped persons who wander aimlessly and hopelessly through the streets on a day-to-day existence.
The problem of homeless individuals, as well as families, has just recently become a public concern.[3] Both local and federal governments have been slow to recognize the plight of these unfortunate individuals, a problem which institutions such as the Mission have been dealing with for decades. The imposition of the requirements and regulations of the Act would inflict havoc upon those institutions which have been rendering not only social, moral and religious services, but also a civil service in filling the gap which government has ignored for these many years.
From the object, nature of the subject matter, contextual setting, mischief sought to be eliminated, proposed remedy and history of the Rooming and Boarding House Act, N.J.S.A. 55:13B-1 et seq., we find the Act is inapplicable to the operation of a charitable non-profit organization such as the Mission. The Act is restricted solely to commercial enterprises operating boarding houses and inapplicable to charitable non-profit organizations offering their services without charge to homeless and socially handicapped persons. "[L]aws and regulations should be interpreted in a reasonable and common sense manner bearing in mind that overly strict enforcement might force the shelter to close, leaving its occupants in a far worse state than remaining in a ... shelter [which is not in compliance with statutory regulations.]" St. John's Evangelical Lutheran *69 Church v. Hoboken, 195 N.J. Super. 414, 421 (Law Division 1983). Imposition of the literal terms of the Act on an institution such as the Mission would frustrate the Mission's expressed purpose and discourage such institutions from taking care of unfortunate, underprivileged and socially handicapped persons.

V
In reaching this determination, we are mindful of the need to see that the Mission meets with general health and safety code requirements. The Department, in its brief, notes that many of the Rooming and Boarding House Act requirements, particularly those for which the Mission was cited, relate only to health and safety objectives. The Department concedes the right of the Mission to promote its religious work but contends that "the activity of teaching a religious doctrine to socially handicapped persons cannot be equated with every aspect of the activity required to house, feed and clothe the persons on an around-the-clock basis for purposes of the First Amendment." The Department contends that the Act is only concerned with the latter activity to insure that the Mission meets general health and safety requirements. We disagree.
On the contrary, the regulations promulgated by the Commissioner pursuant N.J.S.A. 55:13B-1 and the Boarding Facility's Bill of Rights, N.J.S.A. 55:13B-18 to 20 cover a variety of areas which are totally incompatible and entirely inapplicable to the Mission's purpose. Specifically N.J.S.A. 55:13B-6 requires the Commissioner to establish standards, in addition to fire and safety requirements, regarding:
... (e) protection from harassment, fraud and eviction without due cause; (g) adequate personal and financial services rendered in boarding houses; (h) disclosure of owner identification information; (i) maintenance of orderly and sufficient financial and occupancy records; ... (k) assurance that no constitutional, civil or legal right will be denied solely by reason of residence in a rooming or boarding house; ... (m) opportunity for each resident to live with *70 as much independence, autonomy and interaction with the surrounding community as he is capable of.
Further, N.J.S.A. 55:13B-19, provides that:
Every resident of a boarding facility shall have the right: (a) to manage his own financial affairs; (b) to wear his own clothing; (c) to determine his own dress, hair style, or other personal effects according to individual preference; (d) to retain and use his personal property in his immediate living quarters, so as to maintain individuality and personal dignity, except where the boarding facility can demonstrate that such would be unsafe, impractical to do so, infringes upon the rights of others and that mere convenience is not the facility's motive to restrict the right; ... (f) to unaccompanied access to a telephone at a reasonable hour and to a private phone at the resident's expense; (g) to privacy; (h) to retain the services of his own personal physician at his own expense or under a health care plan and to confidentiality and privacy concerning his medical condition and treatment; (i) to unrestricted communication, including personal visitation with any person or his choice, at any reasonable hour; (j) to make contacts with the community and to achieve the highest level of independence, autonomy, and interaction with the community of which he is capable; (k) to present grievances on behalf of himself or others to the operator, State governmental agencies or other persons without threat of reprisal in any form or manner whatsoever; (l) to a safe and decent living environment and considerate and respectful care that recognizes the dignity and individuality of the resident; (m) to refuse to perform services for the boarding facility, except as contracted for by the resident and operator; (n) to practice the religion of his or her choice, or to abstain from religious practice; and (o) to not be deprived of any constitutional, civil or legal right solely by reason of residence in a boarding facility. Id.

These standards are so disparate with the operation of a non-profit charitable religious institution as maintained by the Mission so as to evidence an intent that the statute and its regulations are inapplicable. Many of these standards are necessary for the orderly and efficient operation of profit-making business concerns of which the Mission is not. The rest of these standards have the effect of requiring the rooming and boarding home industry to protect and respect, at least minimally, the dignity, independence, individuality and private rights of their residents which are often overlooked or pushed aside as rooming and boarding home operators strive to achieve their ultimate objective of running a profitable business. These standards are necessary in the regulation of the rooming and boarding home industry because the legitimate profit-making objectives of the industry can conflict with the maintenance of *71 these standards. They are inapplicable and unnecessary for the regulation of institutions such as the Mission because the Mission has as its very purpose the promotion and development of human dignity. The Mission's objectives do not conflict with the standards set forth in the Act. To the contrary, the Mission achieves these objectives to a greater degree than compliance with the Act would require.
We recognize that the Supreme Court has repeatedly held that religious organizations must comply with fire, building and health regulations. Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745, 756-757 (1971); Tony and Susan Alamo Foundation v. Sec. of Labor, 471 U.S. 290, 305, 105 S.Ct. 1953, 1964, 85 L.Ed.2d 278, 291 (1985). Although the regulations promulgated by the Department, N.J.A.C. 5:27-6.1 et seq., deal, in part, extensively with building maintenance, fire safety, building security, general health matters, and safety codes, we are satisfied that these "secular" requirements of the statute and regulations are adequately regulated by existing statutes and ordinances relating to fire, building and health regulations and requirements. In this respect, as we noted earlier, foster homes, community residences for the developmentally disabled, dormitories owned or operated by non-profit institutions of primary, secondary, or higher education used by students, facilities occupied exclusively by full-time students, and premises owned or operated by a non-profit or religious corporation or association in which an owner-occupied one-family dwelling is made available to not more than six guests for charitable purposes and where the owner derives no income from the use of the premises, N.J.S.A. 55:13B-3(a), are excluded from the Act. These facilities likewise are regulated by other governmental agencies or secular rules and regulations. Further, we note that non-profit homes for the aged, which are more typical of proprietary homes, appear to have better facilities and services than predominantly public ones. Report of the Commissioner of Health's Advisory Committee on Boarding Homes, supra at 22.
*72 The determination of the Commissioner of the Department of Community Affairs entered May 31, 1984 is reversed and the total penalty against Market Street Mission in the sum of $3,050. is vacated. In view of the foregoing we deem it unnecessary to consider the remaining issues raised by the Mission.
NOTES
[1] The "Rooming and Boarding House Act of 1979," P.L. 1979, c. 496 (C. 55:13B-1 et seq.) was amended to exempt from coverage under the act owner-occupied, one family residential dwellings made available for occupancy by guests where the primary purpose of the occupancy is to provide charitable assistance to the guests and where the owner derives no profit from the occupancy. The maximum number of such guests is limited to six.
[2] In accordance with the legislative mandate the Commissioner has promulgated numerous regulations: N.J.A.C. 5:27-1.1 et seq. These regulations are divided into 12 subchapters: Administration and Enforcement, N.J.A.C. 5:27-1.1 to 1.2; Definitions, N.J.A.C. 5:27-2.1; Rights of Residents, N.J.A.C. 5:27-3.1 to 3.12; General Building Requirements, N.J.A.C. 5:27-4.1 to 4.9; Fire Safety, N.J.A.C. 5:27-5.1 to 5.9; Security, N.J.A.C. 5:27-6.1 to 6.3; Residents' Comfort, N.J.A.C. 5:27-7.1 to 7.4; Maintenance of Records, N.J.A.C. 5:27-8.1 to 8.4; Food and Laundry Services, N.J.A.C. 5:27-9.1 to 9.5; Other Personal Services, N.J.A.C. 5:27-10.1 to 10.6; Financial Services, N.J.A.C. 5:27-11.1 to 11.7 and Fire Safety Loans [sic], N.J.A.C. 5:27-12.1 to 12.3.
[3] For a discussion of state, local and federal response to this problem, see Maticka v. The City of Atlantic City, 216 N.J. Super. 434 (App.Div. 1987).