MARKET STREET MISSION, RESPONDENT, v. BUREAU OF ROOMING AND BOARDING HOUSE STANDARDS, DEPARTMENT OF COMMUNITY AFFAIRS, STATE OF NEW JERSEY, APPELLANT.

Argued February 29, 1988—Decided May 19, 1988.

*John J. Chernoski,* Deputy Attorney General, argued the cause for appellant (*W. Cary Edwards,* Attorney General of

New Jersey, attorney; *Michael R. Clancy,* Deputy Attorney General, of counsel; *John J. Chernoski* and *Daniel P. Reynolds,* Deputy Attorney General, on the briefs).

*Gary C. Algeier* argued the cause for respondent (*Rand, Algeier, Tosti, Woodruff & Frieze,* attorneys; *Gary C. Algeier* and *John F. McDonnell,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

The question in this case is whether the Legislature intended that the fire safety provisions contained in the Rooming and Boarding House Act of 1979 (the Act), *N.J.S.A.* 55:13B–1 to –21, apply to religious organizations that provide rooming and boarding facilities to the needy.

We hold that the State has the power to impose public safety requirements on organizations, both religious and secular, that provide such services. We also hold that the Legislature did not intend a wholesale exclusion of religious organizations from those requirements of the Act that would not intrude on the religious rights of the groups' members. Rather, we believe that the selective exclusions afforded from the Act's otherwise broad coverage indicate that the Legislature intended that the Act achieve its secular purposes without infringing on the constitutionally protected interests of the religious organizations. Hence, we reverse the Appellate Division's judgment that the Legislature did not intend any of the Act's provisions to apply to religious organizations. We remand this matter to the Bureau of Rooming and Boarding House Standards (Bureau) for further proceedings in accordance with this opinion.

I

Procedurally, the case arises from a 1984 inspection of the Market Street Mission by the Bureau, the agency then entrusted with the administration of the Act. The Bureau found several violations of fire safety regulations and ordered their

abatement. Following a reinspection in May of 1984, the Bureau assessed a penalty against the Mission in the amount of $3,050 for failure to comply with the earlier inspection report.

The Mission requested a hearing to contest the penalty and the jurisdiction of the Bureau. Although the Administrative Law Judge (ALJ) upheld the jurisdiction of the Bureau and the penalty imposed, he declined to decide the equal protection and free exercise of religion issues raised by the Mission. The Commissioner of the Department of Community Affairs (DCA) affirmed the ALJ's decision. On appeal, the Appellate Division reversed the Commissioner's decision and held that "the Act is inapplicable to the operation of a charitable non-profit organization such as the Mission." *Market St. Mission v. Bureau of Rooming and Boarding House Standards*, 217 *N.J.Super.* 56, 68 (1987).

The Appellate Division noted the broad powers that the Act grants to the Commissioner to promulgate regulations and to establish safety, service, and record-keeping standards. In particular, the court reviewed the Act's "Bill of Rights," *N.J.S. A.* 55:13B–17 to –21, which grants fifteen specific rights to all residents of rooming houses, boarding houses, and residential health care facilities. *Market St. Mission, supra*, 217 *N.J.Super.* at 63. One of the rights conferred by the Act is the freedom "[t]o practice the religion of [one's] choice, or to abstain from religious practice." *N.J.S.A.* 55:13B–19n. Another provision permits a resident to refuse to perform services for the institution except pursuant to a bona fide contract. *N.J.S. A.* 55:13B–19m.

The court found that many of the rights conferred by the "Bill of Rights" upon the residents of boarding houses "cover a variety of areas which are totally incompatible and entirely inapplicable to the Mission's purpose." 217 *N.J.Super.* at 69. The court also found that the Mission's purposes render inapplicable many of the regulations enacted by the Commissioner pursuant to the Act. *Id.* Those provisions permit the Bureau

to oversee and to review the day-to-day operations of rooming and boarding houses and would allow the Bureau to do such things as (1) "review the [Mission's] 'house rules' and void those it deems 'unreasonable,' " (citing *N.J.A.C.* 5:27–3.2), and (2) prevent the eviction of any resident except for "good cause" as defined in the Anti–Eviction Act, *N.J.S.A.* 2A:18–61.1 to 61.12, which governs landlord-tenant relations (citing *N.J.A.C.* 5:27–3.3(c)). 217 *N.J.Super.* at 64. The Appellate Division reasoned that "[t]he imposition of the requirements and regulations of the Act would inflict havoc upon those institutions which have been rendering not only social, moral, and religious services, but also a civil service in filling the gap which government has ignored for these many years." 217 *N.J.Super.* at 68.

The court also noted that the Act focused on commercial enterprises and did not specifically refer to charitable non-profit organizations that provide spiritual counseling and work programs to the homeless and to socially troubled individuals; it concluded that the Legislature did not intend the Act to apply to such organizations. The court thus held that an exemption for such religious non-profit institutions as the Mission was a fair and reasonable implication of the Act as written. 217 *N.J.Super.* at 68–69.

We granted certification to review that decision. 108 *N.J.* 584 (1987).

## II

For purposes of this appeal we accept the statement of facts set forth in the Mission's Appellate Division brief. The Market Street Mission was established approximately one hundred years ago. It occupies a three-story brick structure in downtown Morristown and can house almost fifty residents. The Mission was formed in order to aid

the spiritual, mental, moral, and physical improvement of men, women and children by conducting a gospel rescue Mission * * * to minister to the spiritual, moral, mental and physical needs of men, women and children, by the proclamation of the message of God's Saving Grace through the sacrificial and

redemptive work of the Lord Jesus Christ on the Cross and by supplying food, shelter, clothing and other necessary comforts to the poor and needy.

The Mission receives no funds or aid from any governmental agency but funds its activities through the operation of a thrift store and through the generosity of private individuals and churches.

The policy of the Mission is set by a Board of Trustees and is implemented by an executive staff of officers. Each trustee and officer must subscribe to a Christian doctrinal statement requiring belief "in the Scriptures of the Old and New Testaments as fully inspired of God, and of Supreme and final authority in faith and life." Respondent states that "[t]he philosophy of the Mission is that through the word of God, a person can overcome [his or her] physical and spiritual problems." To present this message to those in need, the Mission opens its house on Market Street to all willing to put their faith in the Christian Gospel.

On entering the Mission, a client or beneficiary is expected to live on the premises for an initial period of ninety days. Moreover, as a condition of residency, each client or beneficiary is required to abide by certain rules (e.g., to attend daily chapel services and weekly Bible classes, to abstain from consuming alcoholic beverages, and to take part in the Mission's therapeutic work program).

There are no leases at the Mission and the residents do not pay rent. Most have no source of income and would be unable to pay if the Mission were to charge rent. The Mission provides not only shelter but also food and clothing, at no cost to its residents.

In addition to attending mandatory religious services, residents are required to participate in the Mission's work program. Since the Mission views this program as restoring a worker's self-image, the residents are not paid for their work.

In short, the Mission operates a self-contained religious community to rehabilitate alcoholics (and others with similar problems), and

[t]he heart of the program is the gospel message that is found in the bible. We don't apologize for the fact that * * * we have a cross at our main entrance. We have a sign that states twenty[-]four hours a day that Jesus saves and that's our basic philosophy, the christian gospel.

The State has no quarrel with the Mission's program; indeed, as freedom of religion represents the freedom that our society's founders primarily sought, it is the very essence of our ideals that the Mission be entirely free to spread its message that belief in divine principles can renew one's body and spirit. The State's only interest in the Mission, avowed again at oral argument, is that the Mission's structures meet the general requirements of public safety laws.

It cannot be doubted that religious institutions do not enjoy an absolute immunity from worldly burdens. *Prince v. Massachusetts*, 321 *U.S.* 158, 64 *S.Ct.* 438, 88 *L.Ed.* 645 (1944) (statute prohibiting sale of articles by minors in public places held applicable to Jehovah's Witnesses). Thus, the Amish must nonetheless withhold, report, and pay Social Security taxes for their employees, although this disturbs their deeply held beliefs.

> Not all burdens on religion are unconstitutional. The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest. [*United States v. Lee*, 455 *U.S.* 252, 257, 102 *S.Ct.* 1051, 1055, 71 *L.Ed.*2d 127, 132 (1982) (citations omitted).]

In this as in so many other situations, a delicate balancing of secular and sacred interests is required. The Appellate Division eschewed any constitutional balancing because it concluded that the Legislature did not intend its regulations to govern the secular aspects of boarding facilities run by a religious group. We are unable to agree.

While the resolution of the constitutional question is not without difficulty, we cannot avoid this issue merely by disregarding the seemingly plain scope of the statute. Under New Jersey law a challenged statute will be construed to avoid constitutional invalidity if the provision is "reasonably susceptible to such interpretation." *State v. Profaci*, 56 *N.J.* 346, 350

(1970). Our standard for construing statutes of uncertain constitutionality closely resembles the principle of construction adopted by the dissent in *National Labor Relations Bd. v. Catholic Bishop of Chicago*, 440 *U.S.* 490, 510, 99 *S.Ct.* 1313, 1323–24, 59 *L.Ed.*2d 533, 547–48 (1979), that statutes should be construed if fairly possible to avoid questions of religious entanglement. But even were we to accept the broader standard elaborated by the *Catholic Bishop* majority, i.e., that interpretations of a statute that would give rise to serious constitutional questions should be rejected unless compelled by the " 'affirmative intention of the Congress clearly expressed,' " *id.* at 506, 99 *S.Ct.* at 1322, 59 *L.Ed.*2d at 545 (citation omitted), we would still find that the New Jersey Legislature intended its licensing statutes to apply to this rooming and boarding house.

The Legislature's intent is clear and unambiguous. The Rooming and Boarding House Act of 1979 was prompted by "a number of boarding home[ ] * * * fires which resulted in fatalities, and [which attracted] public attention * * * to the conditions that existed in these facilities." G. Gordon and D. Lazarus, "New Jersey's Rooming and Boarding House Act: Its Effects and Effectiveness," 12 *Seton Hall L.Rev.* 484, 492 n. 63 (1982). Among the Legislature's findings were that

> [t]he residents of such facilities are predominantly elderly, disabled and poor, many of whom need social, personal and financial services, *protection from building hazards* and protection from unscrupulous and predatory neighbors * * *.
>
> This remedial legislation is therefore necessary to provide for the health, safety and welfare of all those who reside in rooming and boarding houses in this State * * *. [*N.J.S.A.* 55:13B–2.]

A rooming house exists where there are two or more units of dwelling space arranged or intended for single room occupancy (exclusive of any such unit occupied by an owner or operator) and where more than fifteen percent of those occupants reside for more than a limited tenure. *N.J.S.A.* 55:13B–3h; *N.J.S.A.* 55:13B–3a. Payment of monies from the residents to the operator is not an element of jurisdiction. *N.J.S.A.* 55:13B–11.-1e.

The Act specifically excludes the following facilities from the category of rooming houses: foster homes; community residences for the developmentally disabled or the mentally ill; student dormitories owned or operated by non-profit institutions of primary, secondary, or higher education; other buildings arranged for single-room occupancy and occupied exclusively by full-time students at approved institutions; and, upon the written authorization of the DCA's Commissioner, any facility or living arrangement operated by, or under contract with, any State department or agency. *N.J.S.A.* 55:13B–3a.

A 1985 amendment demonstrates the Legislature's intent to maintain the broad sweep of the Act, beyond the purely commercial milieu: the amendment specifically excludes from the scope of the Act premises owned or occupied by non-profit or religious core organizations in which an owner-occupied one-family dwelling is made available for charitable purposes to not more than six guest occupants and where the owner derives no income from the occupancy of the premises. *N.J.S.A.* 55:13B–3a. As stated by the Assembly Committee,

[t]he bill [was] prompted, according to the sponsor's statement, by incidents of "individuals who, for charitable reasons, have taken the needy into their homes" and who have thereupon been "declared to be operating boarding homes ... and subject to the licensing requirements of the act and the regulations promulgated thereunder ... an undue burden upon these individuals." [Assembly Housing and Urban Policy Committee Statement, Senate No. 2697—*L.*1985, *c.* 364.]

This amendment would have been unnecessary if the Legislature had originally intended the Act not to include all boarding facilities owned by religious or non-profit associations or corporations.

We find that the legislative history confirms that the Legislature would have intended the statute to extend as far as its constitutional reach would permit. *See Maressa v. New Jersey Monthly,* 89 *N.J.* 176, *cert. denied,* 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L.Ed.*2d 169 (1982). This is not a direct regulation of speech or of the exercise of religion, where overbreadth would be fatal.

*See State v. Cameron,* 100 *N.J.* 586, 599 (1985) (municipal zoning ordinance excluding "churches and similar places of worship" from residential use district found unconstitutionally vague).

## III

In sum, we cannot conclude that the Legislature intended to exclude religious organizations from the Rooming and Boarding House Act. We suspect that had there been a fatal fire at a religious boarding house, society would not have shrugged its shoulders and concluded that the tragedy was of no moment since it had befallen a religious shelter. The State's legitimate concern for safety need not end at the shelter's door.

The establishment clause proscribes excessive entanglement and permits only minor and unobtrusive State supervision of religiously oriented affairs. The regulatory scheme cannot require such "comprehensive, discriminating and continuing state surveillance" as would constitute entanglement. *Lemon v. Kurtzman,* 403 *U.S.* 602, 619, 91 *S.Ct.* 2105, 2114, 29 *L.Ed.*2d 745, 759 (1971). We are confident that the Bureau will pursue the least restrictive means to achieve the State's overriding concern. At this juncture we need not invalidate the Act's general requirements merely because they may be amenable to an unconstitutional application.

> It has not been the Court's practice, in considering facial challenges to statutes of this kind, to strike them down in anticipation that particular applications may result in unconstitutional [action]. [*Roemer v. Board of Pub. Works of Maryland,* 426 *U.S.* 736, 761, 96 *S.Ct.* 2337, 2352, 49 *L.Ed.*2d 179, 196 (1976).]

*See also IMO Application of Maria Martin,* 90 *N.J.* 295 (1982) (Casino Control Commission's licensing applications for casino employees do not facially violate constitutional rights of freedom of association, privacy, freedom from unreasonable searches and seizures, or privilege against self-incrimination).

Of course, should the Bureau exercise its discretion in a manner that unnecessarily intrudes into the Mission's religious affairs, we shall promptly reconsider the matter. "It is worth

remembering that the forefathers of many of us came to these shores to escape, among other things, government regulation of their forms of worship." *State v. Cameron, supra,* 100 *N.J.* at 609–10 (Clifford, J., concurring). Government has more than enough legitimate opportunities to exercise its police power than to squander that power in the needless regulation of religious organizations providing the most fundamental of human needs, shelter and care, to the less privileged of our society.

We find that the State's program for licensing rooming and boarding houses applies to sectarian institutions and that facially it neither unduly interferes with the free exercise of religion nor creates an excessive State entanglement with religion. At the same time, we recognize the good faith with which the Market Street Mission has pursued its appeal. We note that the State has the power to reconsider the imposition of any penalties assessed during the pendency of these proceedings. We were informed at oral argument that the housing defects have been cured.

The judgment of the Appellate Division is reversed. The matter is remanded to the Bureau for reconsideration of the penalties.

*For reversal and remandment*—Chief Justice WILENTZ and Justices HANDLER, O'HERN, GARIBALDI, and STEIN—5.